PEOPLE *v.* HOY.

DECISION OF THE COURT

1. DISORDERLY CONDUCT—ALCOHOLISM—PUNISHMENT.

Conviction of defendant of being a disorderly person by being drunk in a public place, third offense, is affirmed by a tripartite Court, against defendant's contention that his drunkenness resulted from the disease of alcoholism and that punishment for having a disease is unconstitutional; on ground that defendant did not show that his alcoholism had reached the point of uncontrollability, per SOURIS and ADAMS, JJ., T. M. KAVANAGH, J., concurring in result only; on ground that penal confinement for doing a prohibited act is not cruel or unusual punishment, per BLACK and O'HARA, JJ.; and on ground that society has the power to protect itself against public drunkenness, which threatens the public peace and good order, and the punishment of imprisonment is not cruel or unusual, per BRENNAN, J., KELLY, J., concurring in result (CLS 1961, § 750.167; CL 1948, § 750.168).

SEPARATE OPINION.

BRENNAN, J.

2. CRIMINAL LAW—DRUNKARDS—ASSISTANCE OF COUNSEL—AFTER-DISCOVERED DEFENSES.

*Defendant who pled guilty to a charge of being drunk in a public place after consultation with a lawyer, his plea being based*

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 12 Am Jur 2d, Breach of Peace and Disorderly Conduct §§ 8, 28, 38, 39; 21 Am Jur 2d, Criminal Law §§ 107, 108.
[2] 21 Am Jur 2d, Criminal Law §§ 107, 108, 309, 315, 321.
[3] 21 Am Jur 2d, Criminal Law §§ 576, 580–582, 583, 590.
[4] 21 Am Jur 2d, Criminal Law § 107.
[5] 12 Am Jur 2d, Breach of Peace and Disorderly Conduct §§ 28, 29, 38, 40.
[6, 9] 21 Am Jur 2d, Criminal Law §§ 592, 593, 610–612.
[7] 21 Am Jur 2d, Criminal Law § 106.
[8] 12 Am Jur 2d, Breach of Peace and Disorderly Conduct § 29; 21 Am Jur 2d, Criminal Law § 14.
[10] 21 Am Jur 2d, Criminal Law §§ 106–108, 610–612.

upon the belief that he had no legal defense, was not denied the assistance of competent counsel, where his lawyer did not advise him of the possibility of defending on the theory that because he was a chronic alcoholic he was unable voluntarily to control the criminal act, a theory which has never been advanced in this State, since incompetence of counsel does not flow automatically from every after-discovered defense (CL 1948, § 750.168). .

3. SAME—PUNISHMENT OF DRUNKENNESS.

Punishment for being drunk in a public place is justified, since the condition poses a threat to the public welfare; the law may punish as a crime any human activity which is detrimental to society and which can be deterred by punishment (CL 1948, § 750.168).

4. SAME—VOLUNTARY DRUNKENNESS.

Voluntary drunkenness is no defense to a crime, since the law does not permit persons by their voluntary acts to place themselves outside the purview of criminal responsibility.

5. SAME—DRUNKARDS—OBJECT OF LAW.

The primary object of criminal law is not to cure alcoholics of their alcoholism, but it is to deter the public drunkard of his proclivity to be drunk and disorderly in a public place.

6. SAME—DRUNKARDS—CRUEL AND UNUSUAL PUNISHMENT.

Incarceration in the custody of the State corrections commission for the crime of being a disorderly person by being drunk in a public place, third offense, is not cruel or unusual, since this is the same punishment that may be imposed on every criminal (CL 1948, § 750.168).

SEPARATE OPINION.

BLACK AND O'HARA, JJ.

7. CRIMINAL LAW—ACTS CONDEMNED—DISEASE.

Several conditions of the person which are denominated as "diseases" by psychiatrists have associated with them acts which the legislature has declared to be criminal offenses.

8. SAME—DRUNKENNESS IN PUBLIC PLACE.

It is within the legislative competence to designate drunkenness in a public place a criminal offense, and decree confinement in a penal institution as punishment (CLS 1961, § 750.167; CL 1948, § 750.168).

9. SAME — DRUNKENNESS IN A PUBLIC PLACE — PUNISHMENT — CONSTITUTIONAL LAW.

  *Confinement in a penal institution as punishment for drunkenness in a public place is the same punishment as is prescribed for several other acts thought by some schools of medicine and psychiatry to result from factors beyond the control of the actor, and is therefore not discriminatorily applied to alcoholics, nor is it in itself cruel or unusual punishment (CLS 1961, § 750.167; CL 1948, § 750.168).*

SEPARATE OPINION.

SOURIS and ADAMS, JJ.

10. CRIMINAL LAW—DRUNKENNESS IN A PUBLIC PLACE—ALCOHOLISM.

  *Defendant who challenges conviction of drunkenness in a public place, third offense, on ground that he is an alcoholic who cannot control his drinking and is therefore being subjected to cruel and unusual punishment must fail where the record does not present a convincing case of an alcoholic whose addiction has reached the point of total uncontrollability.*

Appeal from the Court of Appeals, Division 2; Quinn, P. J. and McGregor, J., affirming Ingham, Salmon (Marvin J.), J. Submitted November 7, 1967. (Calendar No. 18, Docket No. 51,563.) Decided May 6, 1968.

3 Mich App 666, affirmed.

Frederick Hoy was convicted of being a disorderly person by being drunk in a public place, third offense, on a plea of guilty. Defendant appealed. Affirmed by Court of Appeals. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Donald L. Reisig,* Prosecuting Attorney, and *James R. Ramsey,* Assistant Prosecuting Attorney, for the people.

*W. Charles Kingsley,* for defendant.

*Amici Curiae:* North American Association of Alcoholism Programs, Area Council on Alcoholism, National Council on Alcoholism, American Civil Liberties Union, and American Civil Liberties Union of Michigan, by: *Peter Barton Hutt, Richard A. Merrill,* and *Covington & Burling (Irwin B. Ellmann* and *Norton J. Cohen,* of counsel).

BRENNAN, J.   Frederick Hoy was convicted of being drunk or intoxicated in a public place, third offense.[1]   Upon a plea of guilty entered October 9, 1964, in circuit court he was sentenced to a term of 1-1/2 to 2 years in State's prison.

A petition to vacate sentence, plea, and for a new trial was filed on his behalf, and on January 22, 1965, a hearing was held on this petition.   The twofold thrust of this petition was that the defendant "unknowingly believed that an attorney could not be of any assistance to him," and that defendant has been subjected to cruel and unusual punishment. Hoy had been represented by counsel at an earlier stage of the proceedings.   The testimony of Mr. Hoy at the January 22d hearing with respect to the matter of counsel is as follows:

"*Q.* Now, in your petition, you say in the first paragraph, that at the time of your arraignment, you unknowingly believed that an attorney could not be of any assistance to you.   Now, is that true, that at the time of the arraignment when you had Mr. Libby there and you wanted him to go ahead with you and stay with you, but the only problem was money, or he would have gone through with the trial; having that in mind, is it true, that at the time of the arraignment, you believed you didn't need a lawyer because a lawyer couldn't do you any good?

---

[1] CL 1948, § 750.168 (Stat Ann 1962 Rev § 28.365).   Hoy was also charged under CLS 1961, § 750.167 (Stat Ann 1962 Rev § 28.364).

"*A.* I didn't even give it any thought, as soon as I was bound over to circuit court, I put up my bond and went and got a lawyer.

"*Q.* Well, now, did you read this petition that was filed here in the last few weeks by Mr. Kingsley in your behalf?

"*A.* Yes, sir, I did.

"*Q.* Now, just look at the last sentence in the first paragraph, it says he, that's you, 'he unknowingly believed that an attorney could not be of any assistance to him.'

"Did you believe that an attorney could not be of any assistance to you?

"*A.* I believed, toward the end, I believed that an attorney couldn't be of any assistance to me, because I would be convicted of this third offense drunkenness, anyway.

"*Q.* You figured you couldn't win?

"*A.* That's right.

"*Q.* That was after you ran out of money, is that correct?

"*A.* Yes.

"*Q.* But you knew that the Court would have given you a lawyer if you needed one and didn't have money?

"*A.* Well, it was never fully clear to me at the time, no. I mean, no one would appeal for me after I was sentenced, until I talked it over with some guys who said you could.

"*Q.* Now, your second paragraph says that you 'were ignorant of any defense and didn't therefore avail yourself of a right to trial.'

"Is this correct, that you were ignorant of any defense? Mr. Libby didn't indicate that you had any defense, is that right?

"*A.* Yes, sir, he never came right out and said anything about this package here, or anything like that; that I could fight it, he never said anything.

"*Q.* Okay.

"Now, do I understand correctly, that what you are challenging now is, that a sick man ought not to be in jail, is that correct?

"*A.* Yes, sir.

"*Q.* You are not challenging the fact that you were drunk and disorderly in a public place on the day in question, is that correct?

"*A.* Yes, sir.

"*Q.* So, it is not the conviction you are talking about, but the sentence, is that correct?

"*A.* Yes, sir."

The petition for a new trial alleges that the principle enunciated in the case of *Robinson* v. *California* (1962), 370 US 660 (82 S Ct 1417, 8 L ed 2d 758), is applicable in Hoy's defense, that such a defense has not been previously recognized in the State of Michigan, and that this case is a test case. The substantive defense presented on Mr. Hoy's behalf is as follows: Hoy is a chronic alcoholic. Alcoholism is a disease. Imprisonment for having a disease is cruel, unusual punishment, contrary to the Eighth Amendment to the United States Constitution.

This case raises two issues:

1. *Whether a plea of guilty is free and voluntary where the accused, after consultation with a lawyer, enters the plea believing that he has no legal defense and subsequently learns of a novel legal theory upon which a test case could have been predicated.*

Perhaps this issue can be restated as follows: Was defendant denied the assistance of competent counsel for his defense where his lawyer did not advise him of the possibility of defending on a theory which never has been known to have been advanced in this State? Defendant Hoy pled guilty to a third offense of being drunk in a public place. This petition seeks to vacate his conviction, set aside his plea, and obtain for him a new trial. At such new trial, it is

proposed to show that the defendant is an alcoholic. And it is proposed to be argued that conviction of an alcoholic for this offense is unconstitutional.

Before a new trial can be reached, the conviction and plea must be vacated. And it must be shown that there was a substantial constitutional defect in the plea and conviction before we can reach the stage of considering the substantive constitutional defense based upon alcoholism.

It is conceded that Mr. Hoy had the benefit of a lawyer at some time prior to the entry of the plea. We can assume from this record that his lawyer did not tell him about the case of *Robinson* v. *California, supra,* or suggest that he might be defended on a theory analogous to that case. From this record we conclude that Mr. Hoy pled guilty in the belief that he had no valid defense to the charge. *If Mr. Hoy's belief* was erroneous and arrived *at* after consultation with an incompetent lawyer, through whose demonstrable ineptitude he was kept in the dark, it could then be said that Mr. Hoy's plea suffered the constitutional infirmity of having been made without the assistance of counsel.

We do not believe it prudent to brand a lawyer with the stigma of professional incompetence because he is so naive as to presume that the law is what it has always been considered to be. Neither do we see the wisdom of encouraging the inmates of our penal institutions to become trail blazers. If incompetence of counsel flows automatically from every after-discovered defense, then the question of whether a defendant has a competent lawyer can never be determined as of the time of the plea, and no plea could be accepted except on the condition that the subsequent development of the law does not later make the plea retrospectively ill-advised.

This would be enough to dispose of this case were it not for the fact that a trial judge has a discretion broad enough to permit him to set aside even a valid conviction based upon a voluntary plea where a manifest miscarriage of justice is shown. It may be well argued that even by his free and voluntary plea, a defendant may not subject himself to cruel and unusual punishment. Thus it is appropriate for us to discuss the second issue.

2. *Whether a statute making it an offense to be drunk in a public place can be constitutionally enforced against a defendant who is an alcoholic.*

The benevolent grape has been a problem for mankind since earliest times. The practice of consuming alcoholic beverages and the effect of overindulgence are matters of common knowledge. Society's interest in these things is everywhere conceded. Society's efforts to prevent drunkenness and avoid its harmful effects upon the body politic have been numerous. Laws punishing those who become intoxicated and in such condition endanger or disturb the peace of their fellow men antedate our Constitution and form a continuous thread throughout our history. It is undoubtedly true that more persons have been convicted and punished for disorderly drunkenness than for any other offense against society. In recent years, a new term has come into general and common usage. The word is alcoholism. The phenomenon of alcoholism is not new. But the word is new and expresses modern society's view of the phenomenon.

Our divorce law (CL 1948, § 552.6 [Stat Ann 1957 Rev § 25.86]), which was written some years ago authorizes petition for divorce "When the husband or wife shall have become an habitual drunkard". Phrases like habitual drunkard and habitual drunkenness expressed the notion quite adequately a hun-

dred years ago.  The appellant's brief puts it this
way:

"At the time when the original Michigan statute
on drunkenness was passed, it was a sin, and sins
had to be punished.  The only treatment was scorn,
shame, vilification, and jails."

By a resolution in 1956, the American Medical
Association proclaimed that alcoholism is a disease.
In the context of public health, the State of Michigan
has also declared that chronic alcoholism is a disease.
Thus the argument is made that our statute punishes
a man for having a disease.  This, it is said, is un-
constitutional, because by its very definition a dis-
ease is an involuntary condition.  We would not, it
is said, punish a man for having cancer or epilepsy,
and we cannot therefore punish an alcoholic for
being intoxicated.

It is possible that different disciplines have differ-
ent words to describe the same phenomena.  What
is in medicine a disease may at the same time in
theology be a sin.  In general, we look to the medical
profession to define diseases.

But it does not follow that the law may not punish
a man for having a disease.  For the law punishes
that which is harmful to society, and medicine treats
that which is injurious to an individual's health.
Thus medical science may develop a body of infor-
mation or knowledge on the subject of theft or mur-
der or rape and doctors may coin words which de-
scribe murderers, or rapists, or thieves and proclaim
their conditions to be diseases.  The law will regard
such definitions as useful only in the frame of ref-
erence of the healing arts.

The law may punish as a crime any human activity
which is detrimental to society and which can be
deterred by punishment.  No one questions that the

appearance of intoxicated persons in public places poses a threat to the peace and good order of society.

But it is said that in the case of an alcoholic the disease affects the mind and such a person is not deterred from going out in public by the sanction of the law. But it cannot be conceded that the sanction of the law does not deter an intoxicated person from committing a crime, and it has always been the rule that voluntary drunkenness is no defense to a crime. This is not because the law does not recognize that in some cases the claim "I was so drunk, I did not know what I was doing" is not literally true. On the contrary, it is because, as a matter of sound policy, the law does not permit persons by their voluntary acts to place themselves outside the purview of criminal responsibility. In such a case, where drunkenness is the proximate condition of the offender, the deterrent force of the criminal law operates to prevent the man from getting drunk in the first place.

But it is said that in the case of an alcoholic, the existence of criminal sanctions does not operate to deter him from getting drunk in the first place, since his alcoholism has so affected his volition that he is unable to avoid the first drink.

This theory of alcoholism does not jibe with the medical testimony presented on behalf of the defendant. The alcoholism of which defendant's doctors speak is an incurable disease. Doctor Bates, testifying in the court below, said:

"*Q.* Doctor, going back to your discussion of chronic alcoholism which I assume is the name of this disease that Mr. Kingsley has been talking about, what is the cure for that disease?

"*A.* There is no cure because a person who had chronic alcoholic (*sic*) can never drink again without great risk of proceeding to the point of drunkenness.

The only control for the disease is complete lifelong abstinence from alcoholic beverages in any form of any kind.

"*Q.* Now, this takes a person with some degree of will power, doesn't it?

"*A.* I am not sure I know scientifically or medically what will power is. It takes education, and determination and many times *pressure from without.*

"*Q.* You mean he has to want to avoid drinking, very strongly, isn't that correct?

"*A.* We have to create an atmosphere where he wants to, yes.

"*Q.* I assume that if you took him into an institution for treatment of this type of situation, you would educate him for a while, but then you would have to let him go, and hope that after he has been educated, he can assert his own determination to avoid this liquor, isn't that right?

"*A.* We would hope to devise means for turning up his determination or making it unpleasant for him to drink again, or make it attractive for him to stay dry, we would try to apply external pressures in addition to his own internal pressures.

"*Q.* Well, what kind of pressures would you use on a fellow who has tried to stop drinking in the past, without success, which, as I understand, is your description of Mr. Hoy?

"Assume that he wants to, at least to some extent, avoid drinking, as I understand you say that he has told you that he tried to unsuccessfully, well, then what kind of pressure would you use to supplement this equal desire on his part?

"*A.* If I were able to get this man a job that he enjoyed, then I could hold the loss of that job over his head if he reverted to drinking. If I were able to establish him in a happy marriage, then the loss of that marriage would be another pressure that would fortify his desire to stay dry. In other words, before I can give him a reason to stay dry, I have to create a happy sobriety for him.

"*Q.* I understand from your testimony that his marriage was in danger because of his drinking?

"*A.* That's right.

"*Q.* If I remember, you said that his wife divorced him.

"*A.* She did.

"*Q.* She did.

"So, apparently as far as Mr. Hoy is concerned, the preservation of that marriage wasn't significant enough factor, is that correct?

"*A.* At that time he was without treatment, and I don't know what kind of marriage it was.

"*Q.* Well, you mentioned that there are two ways in general that you try to help a man with less than the needed will power, one is to create a favorable situation and hope that he will go out of his way to preserve that favorable situation, and the other is to put pressure on him.

"Now, what kind of pressure would you put on him?

"*A. The loss of that favorable situation,* the fear of damage to his health, or if he continued to drink, all the suffering he has had, economic loss, and *feeling of guilt* that he has suffered from drinking." (Emphasis supplied.)

There is no question but that the medical opinion presented on behalf of the defendant establishes that the sanction of criminal law *has some deterring effect on a sober alcoholic.* A man who is out of jail and free is surely in a favorable situation *vis-a-vis* a man who is in prison. As a matter of fact, it would appear that the treatment provided by the law for alcoholics already follows quite closely the prescription of Doctor Bates. Through laws dealing with the rights of employees, hours of employment, conditions of employment, holidays, collective bargaining, workmen's compensation, unemployment compensation, marriage and divorce, compulsory education, higher education, and a host of others, the

law attempts to "create a happy sobriety" for al-
coholics.  By making men responsible for alcoholism,
the law permits a drunkard to suffer the loss of his
job, the loss of his wife and family, in short, "the
loss of that favorable situation" which moderation
or abstinence creates.  The law permits economic
loss to flow from alcoholism, by the same process
of treating the alcoholic as *sui juris*.  Further, and
consistent with the course of treatment outlined by
Doctor Bates, the law sharpens and increases the
alcoholic's "feeling of guilt."

But it is said that the law does not have any sub-
stantial deterring effect on habitual drunkards.  The
argument of the "revolving door" is that alcoholics
are arrested, convicted, jailed, and released time
after time without being cured of their alcoholism.

The "revolving door" argument fails for two rea-
sons:

First, because it misapprehends the goal of the
criminal law.  It is not the *primary* object of crim-
inal law to cure alcoholics of their alcoholism.  In
the sense that criminal jurisprudence or penology
deals in "cures" at all, their primary object is to
"cure" the *public* drunkard of his proclivity to be
drunk and disorderly in a public place.

Second, and most importantly, the "revolving
door" argument simply cannot be demonstrated em-
pirically.  As a matter of fact, insofar as statistics
are available, the exact opposite is true.  The sanc-
tion of the criminal law *does* reduce public drunken-
ness, and if public drunkenness be equated with
alcoholism, it does cure alcoholism.

In the year of 1965, we can take judicial notice
that there were thousands of persons convicted of
public drunkenness in Michigan.  But the records
of the department of corrections for that year show
that only 6 persons were imprisoned for drunken-

ness in a public place, third offense.[2] This would surely represent less than 1% of the total number of persons arrested for the offense.

If we assume vigorous law enforcement, it follows that over 99% of those arrested for public drunkenness, first and second offenses, *do not commit a third offense*. And while it does not follow that the 99% have been cured of their alcoholism, it is at least an enviable record of curing *public* drunkenness.

But it is said that vigorous law enforcement cannot be presumed. It is claimed that policemen, prosecutors and judges exhibit inexhaustible leniency on the so-called "harmless drunk," as a result of which he is never charged with the third offense, but is repeatedly jailed and released on misdemeanor charges.

Defendant Hoy himself can be cited as an example. He has been arrested on drunk charges over 20 times, *but never until now charged as a third offender*.

But conceding that a 99-to-1 ratio of misdemeanor charges to third offense warrants would not justify a 99-to-1 success ratio, there is a fair inference that even lax and indifferent enforcement of the law has *some* deterring effect on these offenders.

And when we look at the record of those cases where third-time convictions *have* been sought and obtained, and prison sentences *have* been imposed, the record of success is even more demonstrable.

If we concede laxity in law enforcement and leniency in punishment, then it must follow that only the most wretched and "incurable" alcoholics are convicted of the third offense.

And if we recognize that over 80% of those convicted of the third offense receive fines, jail terms

[2] Criminal Statistics—1965, published by State of Michigan Department of Corrections.

and probation, then it must also follow that only the hopelessly hopeless of these most wretched and incurable souls are ever actually sent to prison.

If we realize that in the year 1965 only *6* such persons were sent to prison in the State of Michigan, it is absolutely amazing that after serving minimum terms of 1 to 1-1/2 years, less good time, they are returned to society as part of a category of parolees who have enjoyed a 76.7% ratio of successful rehabilitation![3]

Indeed, if there is a rising problem of alcoholism in the nation today, it may very well be that a contributing and substantial cause of the rise can be found in the very reluctance of the law to use the full measure of its time-tested antidotes.

Compare Doctor Bates' prescription:

"*A*. At the present time, his therapy would only need to be psychiatric in so far as that subdivision of medicine. He needs *to be educated as to what alcoholism is,* and he needs *rehabilitation in his society,* he needs *spiritual* help in enable (*sic*) him to understand society, and in enable (*sic*) him to form a close association with other people, family associations, society grouping, and other encouragement to attend groups of other alcoholics who are seeking their own salvation. I would teach him everything that I know about this disease and expose him to other people who have had it and have been successful in rehabilitation *on the hope* that he continued with some sort of therapy *for a period of at least two years* to include *a minimum of 90 hours of instruction on his* disease."

and Doctor Donald Damstra's prescription:

"*A*. Well, we never refer to them as cures. Treatment basically is aimed at helping the alcoholic to understand his disease to know as much about

---

[3] Criminal Statistics (1965), published by State of Michigan Department of Corrections.

it as can be taught to him in a scientific manner, then to help him create an environment and atmosphere where he will be able to maintain prolonged sobriety. We feel that if such a law was to provide treatment and continuing treatment; *this, of course, is most often gained through the lifelong association of Alcoholics Anonymous."*

with defendant's description of his treatment in prison:

"*Q.* Did you tell them about your drinking problem and that you ought to get a little help for that while you were in prison, did you tell them about that?

"*A.* Yes, sir, I did.

"*Q.* Well, what did they say or what did they do?

"*A.* Well, they suggested that I attend the AA on the weekends.

"*Q.* Have you done it?

"*A.* Well, I was working in the mess hall and kitchen, and the kitchen is a full time job so I couldn't get to go to most of them, but I have been to one, I have been transferred out of the kitchen, to the mail room, so I have attended one meeting.

"*Q.* When was that?

"*A.* About two weeks ago.

"*Q.* Now, how long have you been in the mail room?

"*A.* I have been in the mail room about a month.

"*Q.* How often do they have these meetings?

"*A.* They have them on Sunday afternoons, closed circuit TV.

"*Q.* How long have you been down in Jackson?

"*A.* I have been in Jackson since October 26.

"*Q.* You have gotten to one meeting so far?

"*A.* Yes."

The punishment which Mr. Hoy received for his crime is the same punishment meted out to every criminal in this State—a term of incarceration in the custody of the Michigan corrections commission,

There is nothing cruel or unusual about it. From a medical standpoint, Hoy's treatment may have been less than optimum. He was not lectured to, unless he chose to attend the lectures; he was not given spiritual help, unless he chose to go to church; he was not placed in close association with other alcoholics, unless he chose to go to the meetings. But that's the way it is in a free society.

If the Civil Liberties Union and the courts who write opinions like *Easter*[4] and *Driver*[5] would like a graphic picture of cruel and unusual punishment, let them read with care the testimony of Doctor Bates:

"*Q.* * * * Now, is this man ever going to be cured?

"*A.* Under the right combination of circumstances, *the proper treatment we have, the facilities with all the tools that I would like to have,* I would give him 25 to 50 per-cent chance of never drinking again. He would never be cured, but I would guess from what I have seen, and how far he has sunk without going for help and his present attitude that there is going to be 25 to 50 chances that he can be induced to prolonged sobriety after perhaps a year or two of work, with a counselor or with an agency with therapy."

And what is the "proper treatment"? What are the tools that Doctor Bates would like to have?

"*A.* There is a drug that *he could be forced to take* or could take voluntarily to make it impossible for him to drink for a period of five days after taking the pill. *We would have to be sure that he took the pill every day* and this would only keep him dry and do nothing to promote the happy sobriety that I would wish for.

4 *Easter* v. *District of Columbia* (DC, 1965), 209 A2d 625; reversed (1966), 124 US App DC 33 (361 F2d 50).
5 *Driver* v. *Hinnant* (DC ED NC 1965), 243 F Supp 95; reversed (CA 4, 1966), 356 F2d 761.

"*Q.* And what is this pill you are talking about?
"*A.* This drug is called Antabuse, A-n-t-a-b-u-s-e.
"*Q.* And what does it do?
"*A. It makes any individual violently ill if he drinks alcohol while the pill is in his system.*"

Surely we would like all our people to be sober. Just as we would like them to be brave, loyal, courteous, reverent, and true. But if medical science discovers a drug which would permanently cure a man from all his antisocial tendencies, what free man would freely take such a pill? And what judge worth the name would condemn a man to suffer thus the forfeiture of his soul?

Medical science cannot make a social drinker out of an alcoholic. Medical science cannot assure continued total abstinence by an alcoholic *against his will* any more than the law can assure it.

If there is in the law a "revolving door", there is also a "revolving door" in medicine. In the book, "Alcoholics Anonymous"[6] is a case history of a man who was committed both voluntarily and involuntarily to Bellevue hospital 35 times without success. His case is not rare.

The truth is, that there is no simple cure for alcoholism which falls within the confines of a single discipline. But alcoholics *can* recover. Drunkards *can* stay sober. This is the great message of "Alcoholics Anonymous."[7]

---

[6] Alcoholics Anonymous (2d ed, new and revised, 1955), Alcoholics Anonymous World Services, Inc., New York City.

[7] "Spiritual Experience.

"The terms 'spiritual experience' and 'spiritual awakening' are used many times in this book which, upon careful reading, shows that the personality change sufficient to bring about recovery from alcoholism has manifested itself among us in many different forms.

"Yet it is true that our first printing gave many readers the impression that these personality changes, or religious experiences, must be in the nature of sudden and spectacular upheavals. Happily for everyone, this conclusion is erroneous.

"In the first few chapters a number of sudden revolutionary changes are described. Though it was not our intention to create such an

The criminal law dispenses the power of governmental sovereignty. It is the ultimate coercive force in society. The fact that alcoholism cannot be cured

impression, many alcoholics have nevertheless concluded that in order to recover they must acquire an immediate and overwhelming 'God-consciousness' followed at once by a vast change in feeling and outlook.

"Among our rapidly growing membership of thousands of alcoholics such transformations, though frequent, are by no means the rule. Most of our experiences are what the psychologist William James calls the 'educational variety' because they develop slowly over a period of time. Quite often friends of the newcomer are aware of the difference long before he is himself. He finally realizes that he has undergone a profound alteration in his reaction to life; that such a change could hardly have been brought about by himself alone. What often takes place in a few months could seldom have been accomplished by years of self discipline. With few exceptions our members find that they have tapped an unsuspected inner resource which they presently identify with their own conception of a Power greater than themselves.

"Most of us think this awareness of a Power greater than ourselves is the essence of spiritual experience. Our more religious members call it 'God-consciousness'.

"Most emphatically we wish to say that any alcoholic capable of honestly facing his problems in the light of our experience can recover, provided he does not close his mind to all spiritual concepts. He can only be defeated by an attitude of intolerance or belligerent denial.

"We find that no one need have difficulty with the spirituality of the program. *Willingness, honesty and open mindedness are the essentials of recovery. But these are indispensable.*

" 'There is a principle which is a bar against all information, which is proof against all arguments and which can not fail to keep a man in everlasting ignorance—that principle is contempt prior to investigation.' —Herbert Spencer"

"THE MEDICAL VIEW ON A.A.

"Since Dr. Silkworth's first endorsement of Alcoholics Anonymous, medical societies and physicians throughout the world have set their approval upon us. Following are excerpts from the comments of doctors present at the annual meeting of the medical society of the State of New York where a paper on A.A. was read:

"Dr. Foster Kennedy, neurologist: 'This organization of Alcoholics Anonymous calls on two of the greatest reservoirs of power known to man, religion and that instinct for association with one's fellows * * * the "herd instinct". I think our profession must take appreciative cognizance of this great therapeutic weapon. If we do not do so, we shall stand convicted of emotional sterility and of having lost the faith that moves mountains, without which medicine can do little.'

"Dr. G. Kirby Collier, psychiatrist: 'I have felt that A.A. is a group unto themselves and their best results can be had under their own guidance, as a result of their philosophy. Any therapeutic or philosophic procedure which can prove a recovery rate of 50% to 60% must merit our consideration.'

by this coercive force alone is no reason for the law
to abdicate its obligation to protect society from
that public and disorderly drunkenness which dis-
rupts our domestic tranquillity and offends against
public safety and the common good.

The conviction is affirmed.

Kelly, J., concurred in the result.

O'Hara, J. (concurring). I would treat appel-
lant's petition to withdraw his guilty plea as a
granted application for delayed appeal raising the
constitutional infirmity of the statute. Thus, I ex-
press no view on division I of Mr. Justice Brennan's
opinion. I address myself only to the appeal on the
merits. As I see it, the constitutional argument
would be the same in principle whether appellant

"Dr. Harry M. Tiebout, psychiatrist: 'As a psychiatrist, I have
thought a great deal about the relationship of my specialty to A.A.
and I have come to the conclusion that our particular function can
very often lie in preparing the way for the patient to accept any sort
of treatment or outside help. I now conceive the psychiatrist's job
to be the task of breaking down the patient's inner resistance so that
which is inside him will flower, as under the activity of the A.A.
program.'

"Dr. W. W. Bauer, broadcasting under the auspices of the Ameri-
can Medical Association in 1946, over the NBC network, said in part:
'Alcoholics Anonymous are no crusaders; not a temperance society.
They know that they must never drink. They help others with similar
problems. * * * In this atmosphere the alcoholic often overcomes
his excessive concentration upon himself. Learning to depend upon
a higher power and absorb himself in his work with other alcoholics,
he remains sober day by day. The days add up into weeks, the weeks
into months and years'.

"Dr. John F. Stouffer, Chief Psychiatrist, Philadelphia General
Hospital, citing his experience with A.A., said: 'The alcoholics we
get here at Philadelphia General are mostly those who cannot afford
private treatment, and A.A. is by far the greatest thing we have been
able to offer them. Even among those who occasionally land back in
here again, we observe a profound change in personality. You would
hardly recognize them'.

"The American Psychiatric Association requested, in 1949, that a
paper be prepared by one of the older members of Alcoholics Anony-
mous to be read at the Association's annual meeting of that year.
This was done, and the paper was printed in the American Journal
of Psychiatry for November, 1949." Alcoholics Anonymous, supra,
pp 569-572.

were convicted for a first time public drunkenness
and sentenced on a misdemeanor charge to the
county jail. The argument, as I understand it, is:
Appellant is an alcoholic. Alcoholism is a disease.
A compulsive incident of this disease is drunkenness.
Confinement in any penal institution for the drunk-
enness of an alcoholic is cruel and unusual punish-
ment proscribed both by the State and Federal
Constitutions.

In the lexicon of medicine, more particularly psy-
chiatric medicine, there are many conditions besides
alcoholism which are denominated "diseases." A
number of these practices have been legislatively
declared criminal offenses. Narcotic addiction which
often includes the illegal possession of narcotics is
one. The affliction of homosexuality when involving
a proscribed act is another. Pyromania, surely a
mental disorder, when extended to encompass the
elements of arson, is yet another. The punishment
which society, through the legislature, has decreed
for the conviction of any of the foregoing illegal acts
is confinement in a penal institution. The convic-
tion, of course, must accord with due process, con-
stitutional guarantees, and is subject to all legally
recognized defenses. This may not be an enlight-
ened view but it is presently society's view as legis-
latively expressed. Whether it accommodates to my
personal view is not relevant. I must function as
a judge under a constitutional government of separa-
tion of powers. To paraphrase Mr. Justice Frank-
furter, there is not a *judicial* remedy for every evil
in a democracy. If the foregoing situation is an evil,
as the proponents of appellant's position contend,
the remedy lies in the legislature and not in the
courts. It is not competent for me judicially to
decide which of the various schools of medicine or
psychiatry has the more effective curative tech-
niques, or any cure at all.

It is within the legislative competence to designate drunkenness in a public place a criminal offense. The punishment decreed for conviction thereof is confinement in a penal institution. That same punishment is decreed for many other acts which certain schools of medicine and psychiatry attribute to environmental factors, hereditary traits, personality disorders or psychological malfunctions. There is no discrimination against alcoholics within the generic classification. Confinement in a penal institution is the norm. Penal confinement is not *per se* cruel or unusual. In this case it is not discriminatorily administered.

I have the utmost sympathy for those members of society who fall within the classification. I earnestly wish legislative study and action would be directed to the problem. As it is, I can find no constitutional infirmity in the punishment legislatively decreed. Perforce, I must agree with Justice BRENNAN. The judgment of conviction is affirmed.

BLACK, J., concurred with O'HARA, J.

ADAMS, J. (*concurring*). In this case there is no issue of right to counsel. Brief for the defendant states "he [defendant] was advised by the Court of his rights to trial and to counsel even at public expense if necessary."

It is defendant's claim that he is a chronic alcoholic with a progressive illness causing him loss of the power of self-control in use of alcoholic beverages.

At the hearing on defendant's petition to vacate sentence and for a new trial, Richard Bates, M.D., managing director of the Alcoholism Therapy Unit at Sparrow Hospital in Lansing, Michigan, testified that he had examined Hoy, had interviewed him for

approximately 30 minutes, obtained from him a history of his drinking habits, and saw copies of his medical and police records. Hoy told him that he had been drinking liquor since age 12, drank enough at age 16 to have a temporary "black-out", was arrested over 20 times on charges related to drinking, was divorced by his wife because of his drinking, and drank himself into a state of amnesia approximately a hundred times. Dr. Bates also testified that Hoy told him that on two occasions, once in 1950 and again in 1961, he stayed away from liquor on a voluntary basis for as long as three months at a time.

Dr. Bates was of the opinion that Hoy was a chronic alcoholic on the date of the offense here involved and that chronic alcoholism is a "lifelong disease from which there is no cure." His evaluation of Hoy's condition was based upon the medical history, the hospital report, the police report and what he was told by other people. Dr. Bates testified he found "no physical symptoms" indicating prior excessive drinking.

Donald L. Damstra, M.D., whose practice was confined entirely to the treatment of chronic alcoholism, testified that he examined Hoy for about one hour on January 22, 1965, the day of the hearing. He was of the opinion that Hoy was a chronic alcoholic. Dr. Damstra was asked whether a chronic alcoholic has control of himself relative to the use of alcohol, and he replied:

"There are certainly times when he does not."

Hoy testified that when he was arrested he knew where he was, he knew he was intoxicated and he knew what he was doing. He described a trip "out West" and stated he gave up drinking for a period of three months during that trip. During those three months he would have an urge to go to a bar

and "have a few  *  *  *  but I fought it." Hoy was asked:

"*Q.* Do I understand correctly, that when you came back here and started drinking after those three months, you didn't drink because you had any strong compulsion to drink, but just because you didn't have anything else to do and you had given up on finding a job, is that why you started to drinking?

"*A.* No, I didn't have no compulsion to drink, I mean it is nothing like a magnet drawing you or anything, but it had been my way of life for so long, I just didn't feel right unless I was sidled up to a bar.

"*Q.* It got to be a habit, it was a comfortable thing to do, is that right?

"*A.* Yes, sir.

"*Q.* But it was a thing that you could stop any time you wanted to, wasn't it?

"*A.* No, I wouldn't say that because I could go about seven days and my hands would start shaking. I noticed the tremor in my hands, and I would go get a drink to calm me down."

Neither the medical testimony nor Hoy's own testimony presents a convincing case of an alcoholic whose addiction has reached the point of total uncontrollability, or even total lack of accountability while in a drunken state. The medical testimony which was offered was based upon a half-hour interview with the defendant by one doctor and an hour interview by another. In my opinion, it completely fails to support the thesis upon which defendant's appeal is based. Furthermore, the defendant's own testimony fails to furnish the necessary underlying support to this thesis. The mere application of a label "chronic alcoholic", which covers a multitude of diverse fact situations, is insufficient

to raise the issues which were sought to be tested
here.  I would reserve decision on those issues.

Because I believe the record shows that defend-
ant's intoxication in a public place resulted from his
voluntary exercise of free choice, I vote to affirm
the Court of Appeals.

SOURIS, J., concurred with ADAMS, J.

T. M. KAVANAGH, J., concurred in result.

DETHMERS, C. J., did not sit.