## STATE v. BERNARD CHARLES FEARON.

166 N. W. (2d) 720.

March 21, 1969—No. 41113.

*Clayton E. Narveson* and *Weis, Frauenshuh & Narveson,* for appellant.

*Douglas M. Head,* Attorney General, *Richard H. Kyle,* Solicitor General, *Joseph P. Summers,* Corporation Counsel, and *Daniel A. Klas,* Special Assistant Corporation Counsel, for respondent.

Heard before Knutson, C. J., and Nelson, Rogosheske, Sheran, and Frank T. Gallagher, JJ.

FRANK T. GALLAGHER, JUSTICE.

Appeal from a conviction in the municipal court of drunkenness under Minn. St. 340.96.

Defendant was observed in a drunken condition on the evening of April 7, 1967, in the city of St. Paul. He was arrested and subsequently tried for violating § 340.96, which provides:

"Every person who becomes intoxicated by *voluntarily* drinking intoxicating liquors is guilty of the crime of drunkenness, and shall be punished as follows:  * * *." (Italics supplied.)

The punishment specified ranges from imprisonment for 40 days or a fine of $40 for the first offense to imprisonment for 60 days to 3 months for the third and each subsequent offense. At trial, defense counsel stipulated that defendant was drunk at the time of his arrest, so the prosecution offered no evidence. As a defense to the charge, defendant asserted that he was a chronic alcoholic and did not drink voluntarily.

Defendant testified in his own behalf, tracing a long history of drinking. He said that he could not control his drinking, although he had made numerous attempts to do so, and that he thought about drinking all the time. By his own admission he has been drunk at least 50 percent of the time for the last 20 years; he has been arrested for drunkenness in Dallas, Los Angeles, and the Twin Cities; and he has lost both his wife and a succession of jobs due to his inability to stay sober. He received a dishonorable discharge from the Army for alcoholism.

Defendant submitted testimony by two psychiatrists, one of whom works with many alcoholics, and by a clinical psychologist, a social worker, and a minister, all of whom work extensively or exclusively with alcoholics. These experts testified that alcoholism is a disease and is rec-

ognized as such by the American Medical Association; that a chronic alcoholic does not drink voluntarily and cannot control his drinking; and that defendant is a "classic case" of chronic alcoholism. When asked on cross-examination if he had an opinion as to whether defendant, if sober, would know the consequences of his act, the psychologist stated:

"* * * [I]f the defendant is an alcoholic—and I am convinced that he is—if he were sober, there is a very good chance that on many occasions with respect to consuming alcoholic beverages he would not be able to make a judgment of right or wrong in terms of consequences of his act."

He further stated that knowing the consequences of any act except those related to drinking is "the essential of the illness, in a sense."

All the testimony and the exhibits, which consisted of records from St. Paul-Ramsey Hospital, Willmar State Hospital, and Hazelden, a private alcoholic treatment center, were received subject to a deferred ruling on admissibility. Without specifically ruling on the evidence, the court found defendant guilty as charged and sentenced him to 90 days. The sentence was suspended in view of the fact defendant was being treated at Hazelden at the time of the trial.

Defendant contends that his conviction must be reversed for two reasons: First, because § 340.96 deals with voluntary consumption of intoxicating liquor, it is not applicable to the chronic alcoholic; and, second, drunkenness is symptomatic of the disease of chronic alcoholism and therefore the cruel-and-unusual-punishment clause of the Eighth Amendment bars imposition of criminal sanctions for drunkenness against the chronic alcoholic. Both defendant and the state have confined their briefs to the latter question.

Whether a chronic alcoholic is subject to prosecution under § 340.96 depends upon the meaning of the term "voluntarily drinking" in the statute. In determining that meaning we are guided by the rule that, unless there is some evidence of a contrary intent, it will be presumed that the legislature intended that the words it used be given their ordinary and usual meaning. State v. Bies, 258 Minn. 139, 153, 103 N. W. (2d) 228, 239.

The portion of the statute quoted at the beginning of this opinion was originally passed in 1889. L. 1889, c. 13, § 1; G. S. 1891, § 1874. It has remained on the books unchanged since that time. The only amendment came in 1907 and affected only the punishment provisions. L. 1907, c. 208. Furthermore, as is typical of statutes dealing with drunkenness,[1] we have seldom had occasion to review it. In the 80 years since its enactment it has been before the court only twice, and neither appeal involved a prosecution for drunkenness. Pett-Morgan v. Kennedy, 62 Minn. 348, 64 N. W. 912, was a civil action for slander based on a statement that plaintiff was drunk the entire Thanksgiving weekend. Section 340.96 was involved because it made such statement an accusation that plaintiff had committed an indictable crime. The court construed the statute to the extent that it determined that the misbehavior charged involved the element of moral turpitude. However, whether this applied to any intoxication or only to intoxication of the extent and duration charged in the statement is not clear from the opinion.

Much more recently the court had occasion to consider the statute in State v. Murphy, 277 Minn. 355, 152 N. W. (2d) 507, an appeal from a conviction for unauthorized use of an automobile. The defendant had previously pled guilty to a charge of drunkenness and claimed that because the use of the car occurred while he was in the drunken condition for which he had been convicted, the subsequent prosecution was barred. The court held the two offenses constituted separate acts, distinct as to time and place, and therefore the two prosecutions were proper. In the course of the opinion the court commented on the statute as follows (277 Minn. 357, 152 N. W. [2d] 509):

"* * * Unlike some ordinances and statutes which punish that offense [drunkenness], § 340.96 does not merely proscribe intoxication

---

[1] Hutt, *The Recent Court Decisions on Alcoholism: A Challenge to the North American Judges Association and Its Members,* reprinted in the President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Drunkenness, p. 109 (hereinafter Task Force Report).

in a public place or intoxication accompanied by disorderly or offensive conduct. The statute punishes any excessive drinking to the point of intoxication."

Unless we are to assume that the court intended to read the word "voluntarily" out of the statute, we must conclude that it is implicit in the above statement that the prohibition extends only to voluntary excessive drinking. This conclusion seems the proper one, since there is no indication that Murphy at any time contended his drinking was not voluntary. In fact, his argument in the case presumed that the drunkenness conviction was proper. It is therefore highly unlikely the court would use that occasion to take such a significant step as to read "voluntarily" out of the statute. Further, it has long been clear under Minnesota law that a person cannot be convicted of a crime where there was no intent to do the act which constitutes that crime. State v. Kremer, 262 Minn. 190, 114 N. W. (2d) 88; State v. Quackenbush, 98 Minn. 515, 108 N. W. 953. Therefore, even without the word "voluntarily" in the statement, it should not be construed to mean that a person who did not choose to drink is subject to conviction.

State v. Kremer, *supra,* is perhaps the best illustration of this concept. There, defendant was convicted of running a red traffic light despite uncontradicted evidence that his brakes failed contrary to his expectations. The court pointed out that if defendant had gone through the light because he did not see it, he would still be subject to conviction; but where he did not intend to proceed forward, he did not intend the act which constituted the crime. Therefore he could not be convicted.

If any inference can be drawn from the omission of the word "voluntarily" from the court's statement in Murphy and the state of prior law, it is that "voluntarily drinking" means drinking by choice, with the intent to drink. Such a construction is consistent with the rule set down at the outset—that where there is no evidence of legislative intent to adopt an unusual or particular meaning for the words used in a statute, they should be given their ordinary meaning.

The ordinary meaning of the word "voluntary" is "produced in or by an act of choice" or of one's own free will. See, Webster's Third New International Dictionary (1961) p. 2564. Since we can find no evidence of any contrary intent by the legislature in this case, we conclude that "voluntarily drinking" as used in § 340.96 means drinking by choice.

We come then to a question which, in various contexts, has produced considerable concern throughout the country: Can a person who is classed as a chronic alcoholic be said to drink by choice? The question is one involving moral, social, and medical, as well as legal, overtones, for the problem of the alcoholic in our society is of far-reaching proportions.[2]

In the context of the present case, however, the answer to the question is not as difficult as it may appear when considered abstractly. The evidence offered by defendant, and unrebutted by the state, is uniformly to the effect that defendant did not drink voluntarily. The experts called by defendant were eminently qualified on the subject of alcoholism, both by study and experience, and all had devoted time to dealing with defendant. Dr. Richard Heilman, one of the psychiatrists who testified, stated in response to a question on whether defendant's drinking was voluntary or involuntary:

"At the present time, whether this man takes a drink or not is not a matter of choice to him. It is beyond the strength of his will to decide whether to drink or not."

He further stated that loss of control over consumption of alcohol is "the very characteristic of why [alcoholism] is a disease."

Dr. Daniel J. Anderson, a clinical psychologist, testified that defendant had exhibited loss of control over both when he would drink and how much he would drink. On cross-examination, Dr. Anderson

[2] Based on statistics from the Joint Information Service of the American Psychiatric Association and the National Association for Mental Health, Mr. Justice Marshall listed 4,000,000 as the lowest current informed estimate of the number of alcoholics in this country, with most estimates much higher. Powell v. Texas, 392 U. S. 514, 527, 88 S. Ct. 2145, 2151, 20 L. ed. (2d) 1254, 1264.

was asked whether defendant would know the consequences of taking the first drink. He answered:

"Sir, to this, I would answer, no sir, he would very likely not know the consequences of his act, even though he were rational and feeling well. The principle here is that in numerous studies that have been done on alcoholics, one of the most pronounced psychological manifestations is the manner in which an alcoholic will rationalize or deny the very consequences of his drinking; again, even to the point of drinking in the face of death, assuming that he can have one or two drinks and will stop.

"Q. Are you stating that he would know the consequences of any act except related to drinking?

"A. Yes, sir. In general, now; yes, sir. This is the essential of the illness, in a sense."

Further examples could be given, but they are unnecessary. It is sufficient to say that defendant's other witnesses offered similar statements.

It is obvious from the record that the testimony of each of the witnesses was based on the underlying proposition that alcoholism is a disease. While the origin of this concept is not particularly recent, widespread acceptance of it, even within the medical profession, is.[3] Therefore, it can be safely assumed that the legislature did not have the chronic alcoholic in mind when it included the word "voluntarily" in the statute in 1889. However, on the evidence presented in this case, defendant was no more able to make a free choice as to when or how much he would drink than a person would be who is forced to drink under threat of physical violence. To ignore such evidence or distort the meaning of words used by the legislature in order to avoid application of advances in man's knowledge of himself and his environment to existing laws would, we think, be a disservice to the law. The fact that a chronic alcoholic would have been considered a voluntary drinker in 1889 does not compel us to conclude that he must be so classed in 1969. We therefore conclude that defendant, as

[3] See, Jellinek, *The Disease Concept of Alcoholism* (1960) pp. 1 to 12.

a chronic alcoholic whose drinking is due to his disease and involuntary, cannot be convicted under § 340.96.

We are aided in reaching this conclusion by several factors. First, while the recent United States Supreme Court decision in Powell v. Texas, 392 U. S. 514, 88 S. Ct. 2145, 20 L. ed. (2d) 1254, affirmed a conviction under a statute making drunkenness in a public place a crime, it did so without a majority opinion. Four justices joined in the opinion announcing the decision and four joined in a dissenting opinion. The deciding vote is represented by Mr. Justice White's concurring opinion, in which he took the position that since there was no evidence the defendant was homeless, the state could convict him of drunkenness in a public place although it could not convict him of drunkenness alone. In view of the fact there were four dissenting justices, this opinion raises at least a substantial doubt as to the constitutionality of § 340.96 if it is interpreted to include the chronic alcoholic.[4] Therefore, under well-established rule and policy we adopt the construction that is clearly constitutional.

Furthermore, the construction adopted here is in line with the position taken by most authorities on the use of the criminal system in dealing with the alcoholic problem.[5] The growth of what E. M. Jellinek has termed the disease conception of alcoholism[6] has caused an extensive reexamination of attitudes and approaches in dealing with alcoholics.[7] The use of arrest and conviction has been condemned on

---

[4] It should also be noted that many of the deficiencies in the Powell record noted by Mr. Justice Marshall in the opinion announcing the decision of the court are not present in the record in this case. For example, as noted earlier, the expert opinion in this case did distinguish between loss of control as to when defendant would drink and loss of control as to how much.

[5] Task Force Report, footnote 1, *supra*; Matthews, *Chronic Alcohol Addiction and Criminal Responsibility: Logic in Search of Law*, 7 Am. Cr. L. Q. 2; Merrill, *Drunkenness and Reform of the Criminal Law*, 54 Va. L. Rev. 1135; Murtagh, *Arrests for Public Intoxication*, 35 Ford. L. Rev. 1; Defender Assn. of Philadelphia, 34th Annual Report of Directors, p. 9.

[6] Jellinek, *The Disease Concept of Alcoholism*, p. ix.

[7] The most recent evidence of this reexamination in Minnesota is the decision by the Minneapolis Civil Service Commission to change its sick-leave

two grounds: It is of no value as a method of deterrence or rehabilitation for the alcoholic, and it degrades and burdens the whole system of criminal justice in this country.[8] As stated by one commentator (Merrill, *Drunkenness and Reform of the Criminal Law*, 54 Va. L. Rev. 1135, 1137):

"* * * It may be in dealing with public drunkenness that the failure of the criminal law has been most pronounced. The system does not deter; it does not rehabilitate; it seldom even treats. To suggest that the prosecution and punishment of derelicts may satisfy some other retributive purpose is an insult to society."

Within the courts themselves criminal conviction of alcoholics has been subject to numerous challenges in recent years, usually on constitutional grounds.[9] The results have been far from uniform. The

___

policy so as to include time away from work for treatment of alcoholism. The reason given for the change was to bring the policy in line with the medical evidence showing alcoholism to be a disease. Minneapolis Tribune, February 28, 1969, p. 21, col. 1.

[8] According to the President's Commission, the best that can be said for the use of the criminal system is that it provides brief periods of forced sobriety. Task Force Report, p. 3. As for its effect, the commission concluded that the arrest and conviction of alcoholics for drunkenness involves an inherent discrimination against the homeless and the poor, fails to reflect the standards of fairness basic to our system, consumes a great deal of police, judicial, and correctional authorities' time that could be far better used elsewhere, and impairs the dignity of the lower criminal courts which are forced to handle these cases somewhat casually and without apparent effect.

[9] E. g., Powell v. Texas, 392 U. S. 514, 88 S. Ct. 2145, 20 L. ed. (2d) 1254; Easter v. District of Columbia, 124 App. D. C. 33, 361 F. (2d) 50; Driver v. Hinnant (4 Cir.) 356 F. (2d) 761; People v. Hoy, 380 Mich. 597, 158 N. W. (2d) 436; City of Seattle v. Hill, 72 Wash. (2d) 786, 435 P. (2d) 692; Dunlap v. City of Atlanta (No. B-29126, Fulton County, Super. Ct. July 17, 1967), reprinted in 113 Cong. Rec. 23759; State v. Ricketts (Cr. No. 8787, Montgomery County, Md., Cir. Ct. October 25, 1967), reprinted in 113 Cong. Rec. 31561; Commonwealth ex rel. Lee v. Hendrick (No. H. C.-0075, C. P. Ct. Philadelphia, August 31, 1967), reprinted in 113 Cong. Rec. 32717.

It should be noted that none of the statutes involved in the above cases

only cases in which there was but one opinion were those heard by only one judge. Even in People v. Hoy, 380 Mich. 597, 158 N. W. (2d) 436, where the conviction was unanimously affirmed, there were three separate opinions and one justice concurred in the result without opinion. Despite this wide range of judicial opinion, there is virtual unanimity on the proposition that the present method of dealing with alcoholics should be changed. Most, if not all, of the opinions upholding the constitutionality of the present system express a hope for prompt legislative action.

We also consider significant the recent action of the Minnesota Legislature on the alcoholic problem. In 1967 it enacted the Hospitalization and Commitment Act, Minn. St. 253A.01 to 253A.21, which governs the commitment, care, and treatment of the mentally ill, mentally deficient, and "inebriate persons." The last class is defined as "any person incapable of managing himself or his affairs by reason of the habitual and excessive use of intoxicating liquors, narcotics, or other drugs." § 253A.02, subd. 4. Obviously, this includes the chronic alcoholic.

Several provisions in the act are of note as to the present legislative attitude toward the alcoholic. Section 253A.02, subd. 17, defines "[a] person dangerous to the public" and includes both the mentally ill and the mentally deficient as possible members of that group, but does not include inebriate persons, although the three groups are treated together in other definitional subdivisions. See, § 253A.02, subds. 8 and 14. In the case of voluntary admittance for treatment, the provisions dealing with release upon demand distinguish between the mentally ill and deficient on the one hand and inebriate persons on the other. The former must be released within 12 hours of demand while the latter may be held for 3 days. § 253A.03. This would seem to indicate some recognition of the nature of the alcoholic's disease as characterized by inability to refrain from drinking.

---

is identical to Minn. St. 340.96. See, State v. Murphy, 277 Minn. 355, 152 N. W. (2d) 507. The one most closely analogous, Seattle City Code, 12.11.020, was construed by the court to apply only to public drunkenness. City of Seattle v. Hill, *supra*.

Perhaps the strongest indication of legislative recognition of the impropriety of criminal treatment of those afflicted with alcoholism is found in § 253A.10, subd. 1 of which provides:

"Except when ordered by the court, no person apprehended, detained, or hospitalized as mentally ill, mentally deficient, or inebriate under any provision of sections 253A.01 to 253A.21 shall be confined in jail or in any penal or correctional institution."

Subd. 2 requires the various political subdivisions to provide and maintain temporary hospitalization facilities for persons awaiting a hearing under the act, and subd. 3 states that the facility provided cannot be part "of a facility used primarily for the detention of individuals charged with or convicted of penal offenses."

It appears to us to be inconsistent with the letter and the spirit of this act to hold that the chronic alcoholic, the individual most obviously an "inebriate person" within the definition in the act, can be convicted and sentenced to up to 90 days in jail when his condition would form the basis for commitment under a statute which bars any confinement in a criminal detention facility. The clear implications of the Hospitalization and Commitment Act are that an inebriate person is neither a criminal nor dangerous and that his problem is one that he cannot control.

Thus, Minnesota has taken at least the first steps in the legislative action called for by the courts of other jurisdictions. The presence in our statutes of both civil and criminal provisions dealing with excessive consumption of alcohol creates no inconsistency provided the latter are properly applied. This is in the first instance a function of the prosecutor and only secondarily one of the courts, for the initial decision whether to seek civil commitment for treatment or imposition of criminal sanctions must be made by the prosecutor.

Because the conviction must be reversed under the language of the statute, we need not reach the constitutional question raised by defendant.

Reversed.