296 S.E.2d 873

**STATE ex rel. Mark Anthony HARPER**

v.

**Jack ZEGEER, Judge, etc., et al., City of South Charleston.**

**No. 14950.**

Supreme Court of Appeals of West Virginia.

May 18, 1982.

On Rehearing July 15, 1982.

Charles R. Garten, Charleston, for relator.

Jack Zegeer, pro se and Harley E. Tingler, South Charleston, for respondents.

Mental Health Association, Inc. by Paul Raymond Stone, Charleston, W.Va. Civil Liberties Union by James F. Humphreys, Charleston, for amicus curiae.

HARSHBARGER, Justice:

After Mark Harper, of South Charleston, was arrested and incarcerated for public intoxication more than a dozen times in 1980, he petitioned by habeas corpus to test the constitutionality of jailing chronic alcoholics who are intoxicated in public.[1]

I.

Medical experts and professional groups have concluded that alcoholism is a disease.[2] The World Health Organization

---

1. We recognize that implicit in most definitions of alcoholism is chronicity. However, we include "chronic" because popular literature often describes those afflicted by this wasteful malady to be "chronic alcoholics"; and because this redundancy emphasizes that we are in this opinion writing about people who are ill, and not about drinking revelers.

2. It was considered to be a disease even in the Nineteenth Century, when a medicinal preparation probably containing bichloride of gold, was used in a four-week treatment plan. *Inebriety in the Gay Nineties,* 15 Drinking and Drug Practice Surveyor 15 (1979).

named it "alcohol dependency syndrome", described to be:

"A state, psychic and usually physical, resulting from taking alcohol, characterized by behavorial and other responses that always include a compulsion to take alcohol on a continuous or periodic basis in order to experience its psychic effects, and sometimes to avoid the discomfort of its absence; tolerance may or may not be present." World Health Organization, *International Classification of Diseases,* 1977.

The National Council on Alcoholism, American Medical Society on Alcoholism, Committee of Definitions concluded:

ALCOHOLISM is a chronic, progressive, and potentially fatal disease. It is characterized by tolerance and physical dependency or pathologic organ changes, or both—all the direct or indirect consequences of the alcohol ingested.

1. "Chronic and progressive" means that the physical, emotional, and social changes that develop are cumulative and progress as drinking continues.

2. "Tolerance" means brain adaptation to the presence of high concentrations of alcohol.

3. "Physical dependency" means that withdrawal symptoms occur from decreasing or ceasing consumption of alcohol.

4. The person with alcoholism cannot consistently predict on any drinking occasion the duration of the episode or the quantity that will be consumed.

5. Pathologic organ changes can be found in almost any organ, but most often involve the liver, brain, peripheral nervous system, and the gastrointestinal tract.

6. The drinking pattern is generally continuous but may be intermittent, with periods of abstinence between drinking episodes.

7. The social, emotional, and behavioral symptoms and consequences of alcoholism result from the effect of alcohol on the function of the brain. The degree to which these symptoms and signs are considered deviant will depend upon the cultural norms of the society or group in which the person lives. Approved by the Executive Committee of the National Council on Alcoholism Board of Directors, June, 1976, 85 Annals of Internal Medicine, No. 6, December, 1976.

An American Medical Association publication, *Manual on Alcoholism,* defined it:

Alcoholism is an illness characterized by preoccupation with alcohol and loss of control over its consumption such as to lead usually to intoxication if drinking is begun; by chronicity; by progression; and by tendency toward relapse. It is typically associated with physical disability and impaired emotional, occupational, and/or social adjustments as a direct consequence of persistent and excessive use of alcohol. American Medical Association, *Manual on Alcoholism* 6 (1968).

*See* Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment, and Rehabilitation Act of 1970, 42 U.S.C.A. § 4541 (1977) (Congress declared that "alcoholism is an illness requiring treatment and rehabilitation"). *See generally* E.M. Jellinek, *The Disease Concept of Alcoholism* (1960); Keller and McCormick, *A Dictionary of Words About Alcohol* (1968); President's Commission on Law Enforcement and Administration of Justice, *Task Force Report: Drunkenness* 1 (1967). *Cf.,* Davies, *Is Alcoholism Really A Disease?,* 3 Contemp. Drug Problems 197 (1974) (alcoholism is a medical and social problem that is best dealt with by physicians and other disciplines); S. Shaw, *A Critique of the Concept of the Alcohol Dependence Syndrome,* 74 Brit.J. of Addiction 339 (1979) (recognizing that a purely medical model is too narrow). *See also, Easter v. District of Columbia,* 361 F.2d 50 (D.C.Cir.1966) (alcoholism as a sickness); *Driver v. Hinnant,* 356 F.2d 761 (4th Cir.1966) (alcoholism as a chronic illness); *Sweeney v. United States,* 353 F.2d 10 (7th Cir.1965) (abstention cannot be part of a probation agreement if a probationer is a chronic alcoholic); *State v. Fearon,* 283 Minn. 90, 166 N.W.2d 720 (1969) (widespread acceptance that alcoholism is a disease); *State v. Street,* 498 S.W.2d 523 (Mo.1973) ("alcohol-

ism is a chronic disease"); *Dayton v. Sutherland,* 42 Ohio Misc. 35, 328 N.E.2d 416 (1974) (alcoholism as a disease); *Wheeler v. Glenn Falls Insurance Co.,* 513 S.W.2d 179 (Tex.1974) ("a substantial school of thought supports the proposition that alcoholism is a disease").

■ We agree that alcoholism is a disease. We also believe that criminally punishing alcoholics for being publicly intoxicated violates the prohibition against cruel and unusual punishment. W.Va. Const. art. III, § 5.[3]

*Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), found that the United States Constitution prohibited criminal punishment of any person for being addicted to narcotics.

It is unlikely that any State at this moment in history would attempt to make it a criminal offense for a person to be mentally ill, or a leper, or to be afflicted with a venereal disease. A State might determine that the general health and welfare require that the victims of these and other human afflictions be dealt with by compulsory treatment, involving quarantine, confinement, or sequestration. But, in the light of contemporary human knowledge, a law which made a criminal offense of such a disease would doubtless be universally thought to be an infliction of cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. *See Louisiana ex rel. Francis v. Resweber,* 329 U.S. 459, 91 L.Ed. 422, 67 S.Ct. 374. *Robinson v. California, supra* 370 U.S., at 666, 82 S.Ct., at 1420, 8 L.Ed.2d, at 763.

In *Powell v. Texas,* 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968), five Justices agreed that alcoholism was a disease, but because of a confusing trial court record

the majority was unwilling to extend *Robinson's* rationale to public intoxication.

*Powell* decided that public intoxication may be criminally punished, but distinguished *Robinson* because the *Robinson* statute sought to punish people who were addicted to a narcotic in Los Angeles County, or who had used a narcotic in Los Angeles County, *Robinson,* 370 U.S. at 663, 82 S.Ct. at 1418; and Texas did not punish Powell for being an alcoholic, or even for being drunk, but rather for being drunk in public. *Powell,* 392 U.S., at 532, 88 S.Ct., at 2154.

Justice White, apparently the deciding vote in *Powell,* wrote that when a record indicated that a defendant is an alcoholic and has no place to be but in public, a prosecution for public intoxication violates the Constitution. 392 U.S., at 551–552, 88 S.Ct. at 2163–2164, (White, J., concurring).[4]

Two landmark decisions recognized that alcoholism is a disease and that alcoholics cannot be criminally prosecuted. In *Driver v. Hinnant, supra,* Driver, an alcoholic, brought a habeas corpus proceeding protesting his criminal conviction and sentence under the North Carolina public drunkenness statute. The Fourth Circuit held that the Eighth Amendment prohibited punishment of alcoholics:

Although his misdoing objectively comprises the physical elements of a crime, nevertheless no crime has been perpetrated because the conduct was neither actuated by an evil intent nor accompanied with a consciousness of wrongdoing, indispensable ingredients of a crime.... The alcoholic's presence in public is not his act, for he did not will it. It may be likened to the movements of an imbecile or a person in a delirium of a fever. None of them by attendance in the forbidden place defy the forbiddance.

---

3. Commentators have urged reform in this area. *See e.g.,* Bason, *Chronic Alcoholism and Public Drunkenness—Quo Vadimus Post Powell,* 19 Am. U.L.Rev. 48 (1970); Nimmer, *Arrests for Public Drunkenness: A Seldom Discussed Reform Strategy,* 54 Judicature 335 (1971); Tao, *Criminal Drunkenness and the Law,* 54 Iowa L.Rev. 1059 (1969); Note, *Criminal Law—The Chronic Alco-*

*holic Versus the Public Drunkenness Statute,* 73 W.Va.L.Rev. 258 (1971).

4. Skid-row alcoholics are only the tip of the iceberg. *See* Stevenson, *The Emergence of Non-Skid-Row Alcoholism As A "Public" Problem,* 45 Temple L.Q. 529 (1972).

This conclusion does not contravene the familiar thesis that voluntary drunkenness is no excuse for crime. The chronic alcoholic has not drunk voluntarily, although undoubtedly he did so originally. His excess now derives from disease. However, our excusal of the chronic alcoholic from criminal prosecution is confined exclusively to those acts on his part which are compulsive as symptomatic of the disease. With respect to other behavior—not characteristic of confirmed chronic alcoholism—he would be judged as would any person not so afflicted. 356 F.2d, at 764.

*Driver* was followed by *Easter v. District of Columbia, supra.* The court relied on a recently enacted law that provided for rehabilitation and treatment of alcoholics, holding that alcoholism was a defense to a public intoxication charge. The District of Columbia Circuit Court recognized that:

An essential element of criminal responsibility is the ability to avoid the conduct specified in the definition of the crime. Action within the definition is not enough. To be guilty of the crime a person must engage responsibly in the action. Thus, an insane person who does the act is not guilty of the crime. The law, in such a case based on morals, absolves him of criminal responsibility. So, too, in case of an infant. In case of a chronic alcoholic Congress has dealt with his condition so that in this jurisdiction he too cannot be held to be guilty of the crime of being intoxicated because, as the Act recognizes, he has lost the power of self-control in the use of intoxicating beverages. In his case an essential element of criminality, where personal conduct is involved, is lacking. This element is referred to in the law as the criminal mind. 361 F.2d, at 52.

These pre-*Powell* cases prophesied a better approach to problems of alcoholism; but *Powell* failed to help. Since *Powell*, no state court has held that alcoholics could not be punished criminally for public intoxication, except Minnesota. Minn.Stat.

§ 340.96 provided that "every person who becomes intoxicated by *voluntarily drinking* intoxicating liquors is guilty of the crime of drunkenness."[5] (Emphasis added.) In *State v. Fearon, supra,* that court determined "voluntarily drinking" applied only to those who consumed liquor by choice, not to alcoholics:

However, on the evidence presented in this case, defendant was no more able to make a free choice as to when or how much he would drink than a person would be who is forced to drink under threat of physical violence. To ignore such evidence or distort the meaning of words used by the legislature in order to avoid application of advances in man's knowledge of himself and his environment to existing laws would, we think, be a disservice to the law. 283 Minn., at 96, 166 N.W.2d, at 724.

Although statutes and ordinances involved here do not use the word "voluntary", we agree with the reasoning of the Minnesota court.

Other courts, however, have held that alcoholism is not a defense to public drunkenness charges. They have emphasized one or more of these notions: drinking is a voluntary action; if alcoholism is allowed to be a defense to public intoxication charges it might become a defense to other crimes, *State v. Brant,* 162 W.Va. 762, 252 S.E.2d 901 (1979); fear that an alcoholism defense will be expanded to other crimes; jail benefits drunks; and there is a distinction between the status of being an alcoholic and the act of appearing drunk in public. *See* Comment, *Public Drunkenness Statutes: An Insanity Defense,* 19 St. Louis U.L.J. 530 (1975). We believe that none of these reasons justifies incarceration of alcoholics.

In *Seattle v. Hill,* 72 Wash.2d 786, 435 P.2d 692 (1967), the Washington Supreme Court found that although Hill was diagnosed to be an alcoholic he did not seem physically deteriorated, and therefore, jailings must have been keeping him healthy.

If uninterrupted drunkenness is a direct cause of death, then undeniably fre-

---

5. Minn.Stat. § 340.96 was repealed by Minn. Laws 1971, c. 90, § 2. In the same year, the Minnesota Legislature adopted § 340.961, which declared that drunkenness is not a crime.

quent periods of confinement in a clean city jail with nourishing food during 20 years of chronic addictive alcoholism, were of beneficial therapeutic effect. Defendant's medical history contributes to the idea that laws against public drunkenness are designed to protect not only society but the offender too. Although we would not recommend jail confinement as a suitable substitute for medical, psychiatric and social therapy in the treatment of alcoholism, we observe that, in the absence of any other available alternatives, the afflicted person derives considerable benefit and protection from it. So did Mr. Hill.

Undoubtedly a beneficial therapy must have intervened to keep the defendant in so good a physical condition that, after 20 years of chronic addictive alcoholism, his doctor could find no physical symptoms of the sickness and had to rely exclusively on a case history to confirm the diagnosis of chronic addictive alcoholism. It thus seems reasonable to conclude that Mr. Hill's frequent periods of confinement in jail, following his bouts of drunkenness, were to a large degree responsible for his continuing physical health. 72 Wash.2d, at 790–1, 435 P.2d, at 696.

See also Burger v. State, 118 Ga.App.2d 328, 163 S.E.2d 333 (1968); People v. Hoy, 380 Mich. 597, 158 N.W.2d 436 (1968).

The Alaska Supreme Court feared that should alcoholism be a defense to public drunkenness charges, there would be a flood of new defenses to other crimes:

> The inevitable result of such a holding is that the chronic alcoholic would also have to be relieved of the legal consequences of other crimes committed while under the influence of alcohol .... Thus, the person who becomes intoxicated involuntarily would have to be excused from acts performed while intoxicated, such as murder, rape, assault and battery, and others. Vick v. State, 453 P.2d 342, 344 (Alaska 1969).

■ The Vick court incorrectly analyzed the Driver/Easter rule. Alcoholism is only a defense to those acts which are compulsive and symptomatic of the disease. Driver, supra 356 F.2d, at 764. The same circuit that decided Easter, later held in Salzman v. United States, 405 F.2d 358 (D.C.Cir.1968), that alcoholism is not a defense to a robbery charge.

Some courts also seem to believe that alcoholics can control their drinking and their appearances in public, contradicting all recognized medical evidence about alcoholics' overwhelming compulsion to drink. See Seattle v. Hill, supra; Budd v. Madigan, 418 F.2d 1032 (9th Cir.1969), cert. denied, 397 U.S. 1053, 90 S.Ct. 1394, 25 L.Ed.2d 669 (1970); Portland v. Juntunen, 6 Or.App. 632, 488 P.2d 806 (1971). Despite Justice Douglas' warning that "those living in a world of black and white put the addict in the category of those who could, if they would, forsake their evil ways," Robinson, supra 370 U.S. at 669–670, 82 S.Ct. at 1421–1422 (Douglas, J., concurring), courts continue to believe that alcoholics could simply stop drinking.

Other courts rely on a distinction in Powell between the status offense of being an alcoholic and the act of appearing in public while drunk. The Ninth Circuit wrote:

> He is not, however, being punished for being a chronic alcoholic; nor is he being punished for drinking. He is being punished for the performance of an act forbidden to one while in a state of extreme intoxication; that of appearing in a public place. Budd v. Madigan, 418 F.2d, at 1034.

See also Seattle v. Hill, supra; In Re Spinks, 253 Cal.App.2d 748, 61 Cal.Rptr. 743 (1967).

■ We disagree with these analyses. Relying on the protections mandated by the West Virginia Constitution, we hold that no chronic alcoholic can be criminally prosecuted for public drunkenness.

Most states have adopted the Uniform Alcoholism and Intoxication Treatment Act that deals with alcoholism as a disease.[6]

---

6. See e.g., Alaska, Colorado, Florida, Hawaii, Idaho, Illinois, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Jersey, New

Others stopped short of decriminalization, and instead developed diversionary systems for both alcoholics [7] and public drunks.[8] In each of these states, when the courts failed to act, the uniform act, or a variant thereof, was soon adopted. We urge our Legislature to enact a comprehensive plan for dealing with alcoholics in a humane and beneficial manner.[9]

■ Criminal punishment of chronic alcoholics violates constitutional prohibitions against cruel and unusual punishment. W.Va. Const. art. III, § 5. However, their public presence is a potential threat to their own and others' well-being, is often offensive, even obnoxious to other people, and the State has a legitimate right to get them off the streets or out of whatever public area in which they may be gamboling.[10]

7. See e.g., Arizona, Arkansas, Connecticut, Georgia, and Indiana.

8. See e.g., Tennessee, Texas, and Utah.

9. See discussion infra.

10. The State has a right and duty to prosecute people who, while drunk, commit crimes: drunken drivers, for example, and peace breachers, assaulters, and such. This opinion is about people who are charged solely with public intoxication.

In nonspecific intent cases, "although intoxication may, by removing inhibitions and dulling perception and judgment, bring on the commission of a crime which otherwise might not have been committed, voluntary intoxication is not a defense to the commission of a crime." Wharton's Criminal Law § 108 (14th Ed.1979). See State v. Bailey, 159 W.Va. 167, 220 S.E.2d 432 (1975). See also State v. Brant, supra.

11. Harper deposition, at pages 10–11.

## II.

Harper contends that incarceration in a "drunk tank" is cruel and unusual punishment. He was imprisoned in the South Charleston City Jail, and testified that only two meals were served each day, and neither bedding nor personal hygiene items such as soap and toothbrush were provided.[11] He submitted a deposition by Robert Allen, a former sanitarian for the Department of Health and currently employed by the Kanawha-Charleston Health Department and consultant to the State Facility Review Panel (generally called the Juvenile Justice Committee, W.Va.Code, 49–5–16b). Allen has inspected, evaluated and ranked sanitary conditions in various county jails. His deposition revealed jail-by-jail descriptions of "drunk tanks" that defy imagination.[12]

Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Vermont, Washington, Wisconsin.

See generally, Koshiba, Treatment of Public Drunkenness in Hawaii, 7 Am.Crim.L.Q. 228 (1969); Pinardi, The Chronic Drunkenness Offender: What One City Is Doing About the Revolving Door, 12 Crime and Delinquency 339 (1966); Robb, The Revision of Wisconsin's Law of Alcoholism and Intoxication, 58 Marq.L.Rev. 87 (1974); Comment, Alcoholism Treatment in Wisconsin: The Need for Legislative Reform, 1973 Wisc.L.Rev. 133; Note, The Chronic Alcoholic: Treatment Versus Punishment, 3 Suffolk L.Rev. 406 (1969); Commentary, Involuntary Committment of Alcoholics, 26 U.Fla.L.Rev. 118 (1973).

12. For example, he described the Wyoming County drunk tank as follows:

"The violations that I found there were one, human feces on commode seats and on different cell floors. No lighting in the cell block, floors, walls, and ceilings filthy, no hand sink provided. Commode was not operational. It was too filthy to check.

There were strong, nauseating odors emitting from different cells. I used this as possible vomit and urine odors. There was no beds provided." Deposition, page 13.

The McDowell County testimony:

"Commode was filthy, hand sink was not operational, floors and walls were filthy, no beds were provided. I put in parentheses must sleep on cement floor." Deposition, page 14.

and Mingo County drunk tank:

"Paint chipped on commode seat, mold growth evident on baseboard of shower, using a sheet for a shower curtain, open windows without screens, and mattress pads filthy." Deposition, page 16.

The Kanawha County Jail fared no better:

"Commode bowl and seat dirty, infestation of roaches, no warm water provided to hand sink, no bunks provided. The steel supports for the walls and ceiling were heavily corroded, becoming deteriorated." Deposition, page 18.

Former Sheriff G. Kemp Melton testified about the condition of the Kanawha County Jail:

"... It is in desperate need of immediate repair. I think spending more money on it is like throwing money down a rat hole. The wiring, the plumbing, the steel is rotting—all of these things need to be taken care of. There are locks that do not work, and a number of federal and state requirements that cannot be met with the present facility.

No one expects jails to be luxury hotels, or as editorialists delight in declaiming, country clubs. But we cannot permit human beings to be penned en masse with dangerous, oftentimes murderous, companions [13] in filthy cages without flushing commodes, with no place to sleep but concrete floors spewn with human excrement, vomit and rodents or insects. Jail conditions are often evaluated by the cumulative effect of intolerable conditions, and using a "totality of the circumstances" test, we notice that many jails in this State are unfit for humans. *Accord, Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *Fielder v. Bosshard,* 590 F.2d 105 (5th Cir.1979); *Kirby v. Blackledge,* 530 F.2d 583 (4th Cir.1976); *Black v. Brown,* 513 F.2d 652 (7th Cir.1975); *Poindexter v. Woodson,* 510 F.2d 464 (10th Cir.1975), *cert. denied,* 423 U.S. 846, 96 S.Ct. 85, 46 L.Ed.2d 68; *McCray v. Sullivan,* 509 F.2d 1332 (5th Cir.1975), *on remand,* 399 F.Supp. 271, *cert. denied,* 423 U.S. 859, 96 S.Ct. 114, 46 L.Ed.2d 86; *Johnson v. Glick,* 481 F.2d 1028 (2d Cir.1973), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324; *LaReau v. MacDougall,* 473 F.2d 974 (2d Cir.1972), *cert. denied,* 414 U.S. 878, 94 S.Ct. 49, 38 L.Ed.2d 123 (1973); *Burks v. Walsh,* 461 F.Supp. 454 (W.D.Mo.1978); *Johnson v. Levine,* 450 F.Supp. 648 (D.Md. 1978), *modified and aff'd.,* 588 F.2d 1378 (4th Cir.); *Owens-El v. Robinson,* 442 F.Supp. 1368 (W.D.Pa.1978); *Palmigiano v. Garrahy,* 443 F.Supp. 956 (D.R.I.1977), *aff'd.,* 616 F.2d 598 (1st Cir.1980), *cert. denied,* 449 U.S. 839, 101 S.Ct. 115, 66 L.Ed.2d 45; *Laaman v. Helgemoe,* 437 F.Supp. 269 (D.N.H.1977); *Walnorch v. McMonagle,* 412 F.Supp. 270 (E.D.Pa.1976); *Miller v. Carson,* 401 F.Supp. 835 (M.D. Fla.1975), *aff'd.,* 563 F.2d 741 (5th Cir. 1977); *Derrickson v. Keve,* 390 F.Supp. 905 (D.Del.1975); *U.S. ex rel. Ingram v. Montgomery County Prison Board,* 369 F.Supp. 873 (E.D.Pa.1974); *Gates v. Collier,* 349 F.Supp. 881 (N.D.Miss.1972), *aff'd.,* 501 F.2d 1291 (5th Cir.1974); *Hendrick v. Jackson,* 10 Pa.Cmwlth. 392, 309 A.2d 187 (1973), *modified on other grounds,* 321 A.2d 603 (1974). *But see Crowe v. Leeke,* 540 F.2d 740 (4th Cir. 1976).

Incarceration in some of the county and city jails in West Virginia does constitute cruel and unusual punishment, and they should be cleaned up or else be closed.

Resources are available under existing programs to establish clean and sanitary centers for publicly inebriated people. W.Va.Code, 60–3–9c (1969), directs increases in prices of alcoholic liquors to provide for care, treatment and rehabilitation of alcoholics:

> For the purpose of providing revenue for care, treatment and rehabilitation of alcoholics, the commissioner in the exercise of his authority under section nine [§ 60–3–9] of this article is hereby directed to increase the price of alcoholic liquors in addition to the price increases provided in sections nine, nine-a and nine-b [§§ 60–3–9, 60–3–9a, 60–3–9b] hereof on or before the last day of March, one thousand nine hundred sixty-nine, in an amount sufficient to produce an additional annual revenue of one million dollars on an annual volume of business equal to the average for the last three years. Such revenue shall be deposited in the state fund general revenue as provided in section seventeen [§ 60–3–17] of this article.

(This section also reveals our Legislature's recognition that alcoholism is a disease.)

It certainly does not meet the fire standards. I, as Sheriff, complained a number of times about this.

Since the County Commission controls the money, the Sheriff can only do what they give him money to do with.

The drunk tank specifically is an area approximately fifteen or eighteen by fifteen or eighteen. It has absolutely no facilities other than toilet facilities in that area.

It is a rectangle area. They have a bench to sit on. It is enclosed by bars. They have toilet facilities and that is just about the extent of it. Deposition, pages 22–23.

13. *See e.g., State v. Rowe,* 163 W.Va. 593, 259 S.E.2d 26 (1979), wherein one Malone, who was arrested for public intoxication and placed in the Wood County communal "drunk tank", was stomped and beaten to death several hours later by fellow prisoners.

In addition, monies saved by reducing the number of people processed and incarcerated in local jails could be directed toward alcoholics' rehabilitation.[14] Formula grant money, money derived from alcoholic beverage taxes and, if the Legislature sees fit to adopt the uniform act,[15] money from the federal government for decriminalization should be sufficient to create well-staffed detoxification and residential treatment centers across the State.[16]

We grant Harper's habeas corpus writ and conclude that jailing of alcoholics for public intoxication is unconstitutional. The State is obliged to develop alternative methods for dealing with public drunkenness and alcoholics.

We will defer further action in regard to incarceration of alcoholics until July 1, 1983 to allow for the development of procedures and facilities to comply with this opinion.

Writ granted.

## ON REHEARING

In *State ex rel. Harper v. Zegeer*, 170 W.Va. 743, 296 S.E.2d 873 (1982), this Court recognized that chronic alcoholism is a disease and held that criminal punishment of alcoholics for public intoxication constitutes cruel and unusual punishment in violation of article three, section five of the West Virginia Constitution. In the decision, the Court delayed the effective date of the ruling until July 1, 1983. This was done in order to allow local and state government officials time to develop more efficient and facile (but not superficial) methods for detaining and treating alcoholics than presently are available.

Twenty days after the decision was handed down, the Attorney General of West Virginia, who was not a party and did not participate in *Harper*, filed a motion to intervene and to extend the time period for filing a motion for rehearing. At the time the Attorney General filed his motion, ten days remained in the rehearing period. Although the Attorney General could have been successful had he submitted a brief with his motion, in its absence we viewed the Attorney General's motion as dilatory and therefore denied it.

The Attorney General did, however, make a brief assignment of grounds for his motion to intervene, and we here take note of those claims. The Attorney General's fundamental concern relates to the fact that the decision affects law enforcement officers in their arrests of persons for public intoxication. As we will discuss below, *Harper* does not affect the duty of such officers to uphold the law and to arrest persons suspected of being publicly intoxicated. The Attorney General's second contention is that the decision does not "provide clear guidance to law-enforcement agencies and lower judicial bodies as to their respective responsibilities in dealing with public inebriates between the date of the Court's decision and July 1, 1983." However, the Legislature has already detailed the responsibilities for the detention and treatment of persons suffering from the disease of alcoholism. The Court assumed law enforcement agencies to be familiar with this law.

Soon after the Court denied the Attorney General's motion, a nineteen-year-old

---

**14.** National Clearinghouse for Criminal Justice Planning and Architecture, *Technical Assistance Report for Kanawha County, West Virginia,* 19, (September, 1978). *See also* Skehan, *Program Offers Hope for Skid-Row Alcoholics,* Worcester Gazette, August 7, 1979, at 9, which discusses the Worcester Public Inebriate Program, a program designed to aid and care for skid row alcoholics once public drunkenness was decriminalized. The Massachusetts program has not only achieved a success rate of almost double the national average, but also has done so for a cost of $15 per night per person, compared with a jail cost of $55 per night per person.

**15.** Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment, and Rehabilitation

Act of 1970, 42 U.S.C.A., § 4576, *et seq.* (1977 and Supp.1981).

**16.** Code, 27–1A–11, states in part:

"The department's programs shall also provide for the training of personnel to work with alcoholics and drug abusers and the informing of the public as well as interested groups and persons concerning alcoholism and drug abuse and the prevention and treatment thereof.

The department may employ such medical, psychiatric, psychological, secretarial and other assistance as may be necessary to carry out the provisions of this section."

youth, jailed on a public intoxication charge, committed suicide in the same South Charleston jail as that involved in *Harper.* In reaction to this tragic incident, the petitioner in *Harper* moved the Court, in a petition for rehearing, to "clarify that incarcerating persons for public intoxication in West Virginia jails is currently unconstitutional." The petition requested that we "set forth with particularity which class of intoxicated persons, if any, can be incarcerated, where that incarceration may take place, and under what conditions," and that we make the opinion effective immediately or detail minimum constitutional requirements for jailing those arrested for public intoxication. The Court granted the petitioner's motion for rehearing, and ordered that the Attorney General be noticed and allowed to participate in the proceeding. The case was subsequently reargued, and the issues raised by the petitioner's motion for a rehearing were addressed. The Attorney General appeared and filed a "Statement of Position of the Attorney General", in which he outlined his previous claims. Stephen and Patricia O'Keefe, the parents of the nineteen-year-old youth who committed suicide in the South Charleston jail, were permitted to intervene in the proceeding and filed an *amicus* brief.

This Court has not declared W.Va.Code § 60–6–9 (1977 Replacement Vol.), to be unconstitutional. That statute provides:

A person shall not:

(1) Appear in a public place in an intoxicated condition;

(2) Drink alcoholic liquor in a public place;

(3) Drink alcoholic liquor in a motor vehicle on any highway, street, alley or in a public garage;

(4) Tender a drink of alcoholic liquor to another person in a public place;

(5) Possess alcoholic liquor in the amount in excess of one gallon, in containers not bearing stamps or seals of the commission, without having first obtained written authority from the said commission therefor;

(6) Possess any alcoholic liquor which was manufactured or acquired in violation of the provisions of this chapter.

Any person who violates subsections one, two, three or four of this section shall be guilty of a misdemeanor and upon conviction shall be fined not less than five nor more than one hundred dollars, or confined in jail not more than sixty days, or both such fine and imprisonment. Any person who violates subsection five or six of this section shall be guilty of a misdemeanor, and upon conviction shall be fined not less than one hundred dollars nor more than five hundred dollars, or confined in jail not less than sixty days nor more than twelve months, or both such fine and imprisonment, and upon conviction of a second or subsequent offense he shall be guilty of a felony and shall be confined in the penitentiary of this State for a period of not less than one year nor more than three years.

The sheriff of any county or his deputy is hereby authorized and empowered to arrest and hold in custody, without a warrant, until complaint may be made before a [magistrate] and a warrant issued, any person who in the presence of such sheriff or deputy violates any one or more of subsection.

When a law enforcement officer perceives a violation of this statute, he has a duty to see that the law is "faithfully executed" in order to enforce the public's right to have violators removed from public areas.

The law of this jurisdiction provides law enforcement officials two procedural options when they encounter a person they believe to be in violation of W.Va.Code § 60–6–9. First, they may issue a citation as provided in W.Va.Code § 62–1–5a (1982 Cum.Supp.). This statute allows law enforcement officers to issue citations to persons who have committed misdemeanors in their presence. The citation specifies that the cited individual must appear before a magistrate within a specified time. This is a particularly useful procedure when dealing with persons who are in violation of W.Va.Code § 60–6–9(2), (3), (4), (5) and (6). It could also be useful when dealing with

violations of W.Va.Code § 60–6–9(1), if the accused is not devoid of the capacity "to properly conduct himself or herself, or his or her affairs, or is [not] dangerous to himself or herself or others, by reason of ... drunkenness ...." W.Va.Code § 27–1–4 (1980 Replacement Vol.), and if another responsible individual is present and agrees to assume responsibility for the safe conduct of the accused.

However, if the officer believes the accused violator lacks the capacity to conduct his or her own affairs, and no other individual is willing to undertake responsibility for the violator, or if the officer "has reasonable cause to believe that the person is likely to cause serious harm to himself or others ....," *id.*, the person may be arrested. Law enforcement officers are authorized and empowered to arrest and hold in custody, without a warrant, for the purpose of bringing before a magistrate any person who in their presence appears in a public place in an intoxicated condition. W.Va.Code § 60–6–9; *see also* W.Va.Code § 62–10–9 (1977 Replacement Vol.). The law requires that the accused must be taken before a magistrate "without unnecessary delay" for a probable cause and bail hearing. W.Va.Code § 62–1–5 (1977 Replacement Vol.).[1] By the rules of this Court magistrates are available 24 hours a day. W.Va. Magistrate Ct.R. 4(c).

■ Presentment before a judicial officer before incarceration on a criminal charge is basic to due process. It has been a fundamental principle of English law since the affirmation of the Magna Carta by King John in 1215 that no freeman shall be imprisoned except as prescribed by the law of the land.[2] The Magna Carta, which was confirmed some thirty times during the Middle Ages, 2 W. Holdsworth, *A History of English Law* at 219 (7th ed. 1956), is but of historical interest, but the consti-

tutions of the United States and West Virginia and the fundamental concept of due process is the law under which we live today. U.S. Const. amend. V; W.Va. Const. art. 3, § 10. Also recognized in our organic law is the requirement of probable cause prior to the seizure of persons. U.S. Const. amend. IV; W.Va. Const. art. 3, § 6.

■ The Legislature, elaborating upon these guarantees of due process, enacted a statute in 1965 which requires that all executive law enforcement officers "making an arrest under a warrant issued upon a complaint, or any person making an arrest without a warrant for an offense committed in his presence, shall take the arrested person *without unnecessary delay* before a [magistrate] of the county in which the arrest is made." (Emphasis added). W.Va.Code § 62–1–5. In *State v. Mason*, 162 W.Va. 297, 249 S.E.2d 793 (1978), we held that this statutory provision is mandatory. The requirement of prompt presentment after arrest for a judicial determination of probable cause is also mandated by Rule 5(a) of our Rules of Criminal Procedure, which provides that: "an officer making an arrest under a warrant issued upon a complaint or any person making an arrest without a warrant shall take the arrested person *without unnecessary delay* before a magistrate within the county where the arrest is made." (Emphasis added). Thus, it is the law of West Virginia that no person may be imprisoned or incarcerated prior to presentment before a judicial officer and the issuance of a proper commitment order. The disposition of persons accused of crime is prescribed by law, not by the caprice of executive and judicial authorities.

In addition to the probable cause determination, other vital due process purposes are served by the prompt presentment requirement. At the preliminary appearance

---

1. The judicial officer may also be a municipal judge or a mayor acting as a municipal judge. *See* W.Va.Code §§ 8–10–1, –2 (1982 Cum.Supp.)

2. The thirty-ninth clause of the Magna Carta provides: "Nullus liber homo capiatur vel imprisonetur, aut disseisiatur aut utlagetur, aut exuletur, aut aliquo modo destruatur, nec super eum ibimus nec super eum mittemus, nisi per

legale judicium parium vel per legum terrae." ("No freeman shall be taken or/and imprisoned, or disseised, or exiled, or in any way destroyed, nor will we go upon him nor will we send upon him, except by the lawful judgment of his peers or/and by the law of the land.") 1 W. Holdsworth, *A History of English Law* at 59 (7th ed. 1956).

before the magistrate, the defendant is informed of his right against self-incrimination and his right to counsel. The magistrate is required to "inform the defendant of the nature of the complaint against him." W.Va.Code § 62–1–6 (1977 Replacement Vol.); *see also* W.Va.R.Crim.P. 5. If the offense is to be presented for indictment, the defendant must be informed of his right to a preliminary hearing. *Id.* At his initial appearance, the defendant must be provided the opportunity to communicate with an attorney, or with another person for the purpose of obtaining counsel or arranging bail. *Id.* As we stated in *State v. Persinger,* 169 W.Va. 121, 286 S.E.2d 261, 270 (1982): "These are substantial rights which the legislature has mandated that should be accorded a person who has been arrested. To permit these valuable rights to be denied or substantially postponed by police officials is plainly against the tenor of the legislative will."

Upon presentment, the arresting officer's only role is that of a complaining witness. Upon his complaint, the judicial officer must determine whether the probative evidence indicates that probable cause exists to believe that the defendant was publicly intoxicated at the time of arrest. If the judicial officer does not find probable cause, then the defendant must be released. If probable cause is found, a warrant for the offense is issued, and the proceeding must then focus on the accused's release on bail.

The judicial officer may release the charged individual on his own recognizance or other bond upon a determination that the accused possesses the necessary rational capability to conduct his own affairs. W.Va.Code § 62–1C–1 (1977 Replacement Vol.). Alternatively, the judicial officer may release the individual into the custody of a responsible person who agrees to be responsible for the accused's actions. However, if it is determined that the accused is an "inebriate", defined by statute as "anyone over the age of eighteen years who is incapable or unfit to properly conduct himself or herself, or his or her affairs, or is dangerous to himself or herself or others, by reason of ... drunkenness ...," W.Va.Code § 27–1–4 (1980 Replacement Vol.), an alternative disposition must be made under the applicable mental health statutes.

If the arresting officer has knowledge that the accused has a previous history of arrests for public intoxication, he has a duty under W.Va.Code § 60–6–9 to bring these facts to the attention of the judicial officer, or to make application for involuntary hospitalization for examination of an accused who, because of his inebriated state, is likely to harm himself or others if allowed to remain at liberty. *See* W.Va. Code § 27–5–2 (1982 Cum.Supp.). Upon such application, or upon his own authority, the judicial officer may order that the defendant be remanded to the custody of the nearest county or regional mental health facility[3] approved by the state, or a state-

---

3. The West Virginia Department of Health offers alcohol and drug services through Community Mental Health/Developmental Disabilities Centers located throughout the state.

Authorities in the respective counties should contact the following mental health centers to determine the nearest facility:

In Mercer, McDowell and Wyoming Counties,
MERCER–MCDOWELL–WYOMING MENTAL HEALTH COUNCIL, INC.
12th Street Extension
Princeton, West Virginia 24740
Telephone: 425–9543 or 425–9541;

In Fayette, Monroe, Raleigh and Summers Counties,
FAYETTE–MONROE–RALEIGH–SUMMERS MENTAL HEALTH COUNCIL, INC.
101 South Eisenhower Drive
Beckley, West Virginia 25801

Telephone: 252–8651;
In Logan and Mingo Counties,
LOGAN–MINGO AREA MENTAL HEALTH, INC.
Route 10, 3-Mile Curve
Box 176
Logan, West Virginia 25601
Telephone: 752–6320 or 752–4357 (Help Line in Service 24-Hour);

In Cabell, Lincoln, Mason and Wayne Counties,
PRESTERA CENTER FOR MENTAL HEALTH SERVICES
P.O. Box 8069
3375 U.S. Route 60, East
Huntington, West Virginia 25705
Telephone: 525–7851;

In Kanawha, Boone, Putnam and Clay Counties,
SHAWNEE HILLS COMMUNITY MH/MR CENTER, INC.
Suite 305, Morris Square

operated mental health facility. Such order must be based on a finding that the accused, because of his own intoxicated condition or other relevant factors, including for example propensity for violence, constitutes a danger to himself or others. Commitment to such a facility may extend for no more than 24 hours without a judicial determination of the need for further detention. W.Va.Code §§ 27-1-4; 27-5-2, 27-1A-11 (1980 Replacement Vol. & 1982 Cum.Supp.). The county jailer, who may be a deputy sheriff, shall be responsible for transporting such individuals "to and from the place of hearing and the mental health facility." W.Va.Code § 27-5-1(d) (1980 Replacement Vol.); *see also* W.Va.Code §§ 7-8-2, -4 (1976 Replacement Vol.). The arresting officer is not authorized by law to provide transportation to or from the mental health facility where the inebriate is to be detoxified.

The Legislature has statutorily created the Department of Health's Division of Mental Health and its Alcoholism and Drug Abuse unit. W.Va.Code § 27-1A-11 (1980 Replacement Vol.). The alcohol abuse personnel "shall assist the director of the department in the establishment of a program for the care, treatment and rehabilitation of alcoholics ...." *Id.* The department is *required* to accept all alcoholics and drug abusers who are involuntarily committed. *Id.*

Additionally, the Legislature has given the Department of Health responsibility for "the care, treatment and rehabilitation of alcoholics and drug abusers ...." The director has an affirmative duty to provide for a "comprehensive program for the care, treatment and rehabilitation of alcoholics and drug abusers ...." W.Va.Code § 16-1-10(19) (1979 Replacement Vol.). It is clear that the Legislature has vested primary responsibility for the treatment of alcoholics in the Department of Health Division of Mental Health. The Legislature has clearly demonstrated by enactment of the mental health laws that it does not contemplate that inebriated persons, as defined by law, should be detained in jails or lockups. The Legislature has specified de-

1212 Lewis Street
Charleston, West Virginia 25301
Telephone: 345–4800;
In Nicholas, Webster, Pocahontas and Greenbrier Counties,
SENECA MENTAL HEALTH/MENTAL RETARDATION COUNCIL, INC.
6 School Street
Richwood, West Virginia 26261
Telephone: 846–2566;
In Calhoun, Jackson, Pleasants, Ritchie, Roane, Tyler, Wirt and Wood Counties,
WESTERN DISTRICT GUIDANCE CENTER
2121 7th Street
Parkersburg, West Virginia 26101
Telephone: 485–1721;
In Marion, Monongalia, Taylor and Preston Counties,
VALLEY COMPREHENSIVE COMMUNITY MENTAL HEALTH CENTER
301 Scott Avenue
Morgantown, West Virginia 26505
Telephone: 296–1731;
In Braxton, Doddridge, Gilmer, Lewis and Harrison Counties,
CENTRAL DISTRICT MENTAL HEALTH CENTER, INC.
Administrative Offices
# 6 Hospital Plaza
Clarksburg, West Virginia 26301
Telephone: 623–5661;
In Barbour, Randolph, Tucker and Upshur Counties,
APPALACHIAN MENTAL HEALTH CENTER

Yokum and Wilmoth Streets
P.O. Box 1170
Elkins, West Virginia 26241
Telephone: 636–3232;
In Grant, Hampshire, Hardy, Mineral and Pendleton Counties,
POTOMAC HIGHLANDS MENTAL HEALTH GUILD, INC.
136 S. Main Street
P.O. Box 1179
Petersburg, West Virginia 26847
Telephone: 257–4687;
In Berkeley, Jefferson and Morgan Counties,
EASTERN PANHANDLE MENTAL HEALTH CENTER
235 South Water Street
P.O. Box L
Martinsburg, West Virginia 25401
Telephone: 263–8954;
In Marshall, Ohio and Wetzel Counties,
NORTHERN PANHANDLE MENTAL HEALTH CENTER, INC.
2121 Eoff Street
Wheeling, West Virginia 26003
Telephone: 233–6250;
In Hancock and Brooke Counties,
HANCOCK–BROOKE MENTAL HEALTH SERVICE
P.O. Box 2010
Weirton, West Virginia 26062
Telephone: 723–5440.

tailed procedures for dealing with alcohol related problems and has directed the Department of Health and its Division of Mental Health to execute those procedures.

The Legislature has provided a means of payment for such treatment via revenue obtained by sale of alcoholic beverages. W.Va.Code § 60–3–9c (1977 Replacement Vol.). Additionally, state law authorizes the director of health to seek reimbursement for the cost of maintenance of patients admitted to state hospitals from the patients themselves or appropriate relatives, provided such individuals have sufficient assets that payment will not work an undue hardship on them. W.Va.Code § 27–8–1 (1980 Replacement Vol.). A third source of revenue is further provided by W.Va.Code § 27–8–2 (1980 Replacement Vol.). If the state hospital is unable to collect a minimum of $150 per annum toward the maintenance of a patient, the county of which the patient is a resident is required to pay the difference between the amount, if any, collected by the institution and $150. W.Va.Code § 27–8–2. Provided, however, that if the county commission establishes a comprehensive local mental health program that is approved by the state director of health, the county may deduct the cost of such program from the payments required by W.Va.Code § 27–8–2. See W.Va.Code § 27–8–2a (1980 Replacement Vol.).

Once an individual has been placed in the custody of a mental health facility via a temporary commitment order, the facility's personnel must provide the necessary care and observation until the person recovers the full use of his faculties. If within the twenty-four hour commitment period the person recovers the use of his faculties, he may be released from the custody of Mental Health and returned to a judicial officer who must inform the accused of his rights and release him on bail.

■ At this point, it must be remembered that the individual remains charged with the crime of public intoxication. That charge must be disposed of through legal proceedings. At this stage of the proceedings, our holding in *Harper* that chronic alcoholics may not be imprisoned for the offense of public intoxication becomes operative. The Legislature has defined an alcoholic as "any person who chronically and habitually uses alcoholic beverages to the extent that he loses the power of self-control as to the use of such beverages, or, while chronically and habitually under the influence of alcoholic beverages, endangers public morals, health, safety or welfare." W.Va.Code § 16–1–10(19)(a). Chronic alcoholism is a defense to a charge of public intoxication. Upon a showing that an accused is a chronic alcoholic, he is to be accorded all of the procedural safeguards that surround those with mental disabilities who are accused of crime.

■ Recognition of this defense to a charge of public intoxication is based on the rationale that alcoholism is a disease and that alcoholics are incapable of controlling their behavior with respect to the consumption of alcoholic beverages. Alcoholics lack the requisite responsibility to engage in the criminal act of public intoxication. By legislative mandate an alcoholic is one who has lost "the power of self-control as to the use of such beverages ...." W.Va.Code § 16–1–10(19)(a). A finding of chronic alcoholism is to be treated as proof of addiction as required by W.Va.Code § 27–6A–5. Therefore the defendant may be hospitalized for up to 40 days for observation and examination. *Id.* Civil commitment proceedings may be initiated during this period. *Id.*

The situation may arise when a person suspected of being an alcoholic pleads guilty to the charge of public intoxication. In such cases, the prosecutor has a duty to offer all known evidence which proves or disapproves the accused's addiction to alcohol. The judicial officer attending the proceeding may render verdicts of not guilty, guilty or not guilty by reason of alcoholism. If the person is found not guilty by reason of alcoholism, he may be committed as discussed above. A verdict of guilty should result in treatment of the accused as provided by law.

The Legislature already has provided a method of payment for treatment of indi-

viduals committed after trial. In 1969, the Legislature ordered the alcoholic beverage control commissioner "to increase the price of alcoholic liquors ... in an amount sufficient to produce an additional annual revenue of one million dollars ...." W.Va. Code § 60–3–9c. The purpose of the price increase and the additional revenue is dedicated to "care, treatment and rehabilitation of alcoholics ...." *Id.* The statute clearly mandates that at least $1 million is to be spent annually on these programs. This has not occurred.

We notice the budget requests made by the governor and the appropriations approved by the Legislature since enactment of the statute in 1969. Despite the command of the West Virginia Constitution that the governor shall prepare a proposed budget in accordance with law, W.Va. Const. art. 6, § 51, the chief executive, who shall take care that the laws be faithfully executed, has proposed expenditures of $1 million dedicated to treatment of alcoholics but once since 1969. Thus, the Legislature has failed to appropriate at least $1 million for any fiscal year between 1969 and 1980. Because separate budget requests and appropriations for the alcoholic/drug abuse unit of the Division of Mental Health have been merged with other divisions since 1980, we cannot determine whether the governor and the Legislature have been any more successful in complying with the law since that time. What can be determined is that of the $11 million collected and due programs dealing with treatment of alcoholics, $4,721,802 has been appointed without including the period from 1980 to 1983. Thus, $6,278,198 collected and dedicated by law to the treatment of alcoholics has not been applied to the purpose intended. Compliance with the law could help solve the problem of how to deal with persons habitually charged with public intoxication.

In outlining the procedures which currently exist, we do not intend to suggest that they are convenient, adequate, efficient, or that they meet the standards set forth in the initial opinion. The procedures we have outlined are minimum statutory requirements now mandated by the Legislature. They need to be streamlined to produce more coordinated procedures and a more easily administered program.