STATE OF MINNESOTA

IN SUPREME COURT

A15-0856

Workers' Compensation Court of Appeals                                    Wright, J.
                                                                Dissenting, Anderson, J.

Ali M. Shire,
                    Respondent,

vs.                                                                   Filed:  February 17, 2016
                                                                  Office of Appellate Courts

Rosemount, Inc., Self-Insured/
Berkley Risk Administrators Company, LLC,

                    Relators,

and

Twin Cities Orthopedics, P.A., Crosstown Surgery Center, and
Minnesota Department of Human Services/BRS,

                    Intervenors.

_____

Michael G. Schultz, Sommerer & Schultz, P.L.L.C., Minneapolis, Minnesota, for
respondent.

Richard A. Riemer, Erstad & Riemer, P.A., Minneapolis, Minnesota, for relators.

_____

S Y L L A B U S

    1.    The    voluntary-recreational-program    exception    to    the    workers'

compensation statute, Minn. Stat. § 176.021, subd. 9 (2014), is not satisfied when the

employees' choices are either to attend the program or risk forfeiting pay or benefits.

1

2.     The phrase "voluntary recreational program" in Minn. Stat. § 176.021, subd. 9, plainly refers to a voluntary "program," not voluntary activities within a program.

Affirmed.

O P I N I O N

WRIGHT, Justice.

This appeal requires us to interpret an exception to the general rule that an employee injured in the course of employment is entitled to workers' compensation benefits.  Specifically, an employer is not liable for injuries incurred by an employee while participating in an employer-sponsored "voluntary recreational program[]," Minn. Stat. § 176.021, subd. 9 (2014).  The Workers' Compensation Court of Appeals (WCCA) concluded that an employee-recognition event sponsored by relator was not "voluntary" because attendance at the event was the only option by which respondent could avoid a loss of pay or benefits.  We conclude that an employer-sponsored recreational program is not "voluntary" when it takes place during work hours and employees must either attend the event or use limited vacation time in order to get paid.  We further conclude that individual activities that take place during a voluntary recreational program do not constitute separate "programs."  We, therefore, affirm.

I.

Respondent Ali Shire worked the Friday-through-Sunday weekend shift as a full-time, permanent employee in the shipping department of relator Rosemount, Inc.  During the last three hours of a weekend shift in October 2012, Rosemount sponsored its annual

employee-recognition event, which was held specifically for the weekend-shift employees of the shipping department. Rosemount's online employee handbook states that "recognition events are voluntary in purpose and all employees have the choice to decide to participate. . . . If an invitation or sign-up sheet is utilized, it should very clearly state the event is voluntary." The handbook does not provide any information about an employee's pay or the use of vacation or unpaid leave during a recognition event.

The compensation judge found, and it is undisputed on appeal, that the weekend-shift employees had three options with respect to the October 2012 recognition event: attend the recognition event and receive their usual wage for the last three hours of the shift, request to use their accrued paid vacation time, or request to take unpaid leave.[1] Rosemount's policy is to limit the total number of employees in a department who are permitted to take vacation or unpaid leave at the same time to no more than 10 percent.

The employee-recognition event consisted of dinner followed by bowling, then a game of laser tag. Shire injured his right ankle while playing laser tag. As a result of his injury, Shire was temporarily and totally disabled from performing his normal job duties for more than one year. He also sustained a 3.98 percent permanent partial disability of the whole body. Shire filed a petition for workers' compensation benefits. Rosemount

---

[1] In addition to hiring permanent employees, Rosemount hires temporary contract workers to assist in the shipping department. The recognition event was not held for the benefit of temporary employees, and temporary employees were not paid to attend. Many temporary employees did attend, however, as guests of the permanent employees, and Rosemount allowed temporary employees to make up the lost three hours of work as "flex hours" during a different shift.

denied liability, asserting that Shire's injury is excluded from coverage under Minn. Stat. § 176.021, subd. 9. Subdivision 9 exempts injuries incurred during "voluntary recreational programs" from workers' compensation coverage. *Id.*

Rosemount advanced two arguments before the compensation judge. First, Rosemount argued that the employee-recognition event was a "voluntary recreational program" because Rosemount provided its employees with alternatives to attendance at the event—the options of requesting to use vacation time or requesting to take unpaid leave. Second, even if the employee-recognition event was not "voluntary," Rosemount argued that Shire's injury falls within the voluntary-recreational-program exception because he was injured while participating in a voluntary game at the employee-recognition event.

In response to Rosemount's first argument, Shire countered that the event was not "voluntary" because it occurred during his shift and he was required to attend in order to obtain his wage without sacrificing his limited vacation time. Shire also argued that he could not take vacation or unpaid leave without his supervisor's prior approval. In response to Rosemount's second argument, Shire contended that the statute addresses the voluntary nature of the employee-recognition *program*, not the voluntary nature of the laser-tag game.

The compensation judge held that the relevant question is whether the "program" was voluntary, not whether the activities within the program were voluntary. The employee-recognition event was not a "voluntary" program, the compensation judge concluded, because without the option of remaining at work for the last three hours of his

4

shift, Shire's only alternatives were to sacrifice either his pay or his limited vacation time. The WCCA affirmed. *Shire v. Rosemount, Inc.*, 2015 WL 2327967 (Minn. WCCA Apr. 22, 2015). Rosemount now seeks review by this court.

## II.

Generally, an employee whose injury "aris[es] out of and in the course of employment" is entitled to workers' compensation benefits. Minn. Stat. § 176.021, subd. 1 (2014). The Legislature created an exception, however, for injuries incurred while participating in employer-sponsored "voluntary recreational programs." *Id.*, subd. 9. The exception provides:

> Injuries incurred while participating in *voluntary recreational programs* sponsored by the employer, including health promotion programs, athletic events, parties, and picnics, do not arise out of and in the course of the employment even though the employer pays some or all of the cost of the program. This exclusion does not apply in the event that the injured employee was ordered or assigned by the employer to participate in the program.

*Id.* (emphasis added).

At issue here is the meaning of the phrase "voluntary recreational program" in subdivision 9, a question of statutory interpretation, which we review de novo. *Dykhoff v. Xcel Energy*, 840 N.W.2d 821, 825-26 (Minn. 2013). The purpose of statutory interpretation is to ascertain the intention of the Legislature. *Ekdahl v. Indep. Sch. Dist. No. 213*, 851 N.W.2d 874, 876 (Minn. 2014). We interpret words employed in a statute according to their plain meaning. *Schatz v. Interfaith Care Ctr.*, 811 N.W.2d 643, 649 (Minn. 2012). To determine the plain meaning of a word, we often consider dictionary

5

definitions. *See Troyer v. Vertlu Mgmt. Co./Kok & Lundberg Funeral Homes*, 806 N.W.2d 17, 24 (Minn. 2011).

We also interpret statutes so as to give effect to each word and phrase. *Allan v. R.D. Offutt Co.*, 869 N.W.2d 31, 33 (Minn. 2015) (stating that statutes should be interpreted such that "no word, phrase, or sentence [is] superfluous, void, or insignificant") (quoting *Am. Family Ins. Grp. v. Schroedl*, 616 N.W.2d 273, 277 (Minn. 2000)); *accord* Minn. Stat. § 645.16 (2014). When a word or phrase has a plain meaning, we presume that the plain meaning is consistent with legislative intent and engage in no further statutory construction. *State v. Struzyk*, 869 N.W.2d 280, 284-85 (Minn. 2015); *see also Allan*, 869 N.W.2d at 33 ("When the language of a statute is plain and unambiguous, it is assumed to manifest legislative intent and must be given effect.") (quoting *Burkstrand v. Burkstrand*, 632 N.W.2d 206, 210 (Minn. 2001)).

A.

Rosemount's principal argument is that the employee-recognition event was "voluntary" because employees had the option of either requesting to use vacation time or requesting to take unpaid leave. Shire contends that he was implicitly compelled to attend the event because attendance was the only option by which he could get paid without using his limited vacation time.

1.

Because the workers' compensation statute does not define the word "voluntary," we begin our plain-meaning analysis with dictionary definitions. According to these definitions, an option is "voluntary" when it is "[d]one or undertaken of one's own free

6

will" or "done willingly and without constraint or expectation of reward." *The American Heritage Dictionary of the English Language* 1941-42 (5th ed. 2011); *see also Webster's Third New International Dictionary Unabridged* 2564 (3d ed. 2002) (defining "voluntary" as "proceeding from the will: produced in or by an act of choice"; "performed, made, or given of one's own free will"; or "acting of oneself: not constrained, impelled, or influenced by another").

Contrary to these definitions, employees were "constrained" by the fact that attendance at the employee-recognition event was the only means by which they could obtain their wages without expending limited vacation time. To hold that a program is "voluntary" under these circumstances would ignore the financial consequences that employees would have faced for failing to attend: either the loss of pay or the depletion of limited vacation time.

Moreover, concluding that a program is "voluntary" under these facts would violate the canon against surplusage, which requires us to give effect to each word and phrase of a statute. *Allan*, 869 N.W.2d at 33. Rosemount argues that a program may be involuntary when vacation and unpaid leave are unavailable during the program. But in that situation the employee has been "ordered or assigned" to attend. *See* Minn. Stat. § 176.021, subd. 9 ("This exclusion does not apply in the event that the injured employee was *ordered or assigned* by the employer to participate in the program." (emphasis added)). If "voluntary" means the opposite of "ordered or assigned," then the word "voluntary" could be eliminated from subdivision 9 without altering the effect of

7

subdivision 9.[2]  Interpreting subdivision 9 in a manner that gives the word "voluntary" no meaning would effectively foreclose the possibility that a program would ever be found involuntary.

Rosemount also contends that it communicated to employees, both through the employee handbook and orally at staff meetings, that the event was "voluntary" and that employees should speak with their supervisor if they did not wish to attend.  But an analysis based solely on an employer's conclusory statements that programs are "voluntary," even when compensation or vacation benefits must be forfeited in order to opt out of attendance, fails to account for the economic bargain struck between employer and employee.  Indeed, every employer could adopt an employee-handbook provision that deems such programs "voluntary" and thus claim the exception in subdivision 9 to shield the employer from workers' compensation liability.  Yet, as happened here, the employer could impose consequences on an employee's failure to attend an event that the handbook describes as "voluntary."  An employer's classification of an event as "voluntary" should not prevail when the facts demonstrate that employees had only one "choice," namely, to attend.

---

[2]  Under Rosemount's interpretation, the statute would read:

> Injuries incurred while participating in . . . recreational programs . . . do not arise out of and in the course of the employment . . . .  This exclusion does not apply in the event that the injured employee was ordered or assigned by the employer to participate in the program.

*See* Minn. Stat. § 176.021, subd. 9.

Similarly, Rosemount's contention that Shire never requested time off is irrelevant. Even if Shire had been granted time off, he would have incurred financial consequences: either the loss of his pay or the loss of his limited vacation time. Effectively, Shire's decision to attend Rosemount's event, under the conditions Rosemount imposed, was "constrained" by his need to earn money—the very purpose of employment. Under these circumstances, Rosemount's employee-recognition event was not "voluntary."

Finally, Rosemount argues that our interpretation of subdivision 9 effectively eliminates the voluntary-recreational-program exception because some employers are logistically unable to offer their employees the option of staying at work during a recreational program. We are not persuaded that subdivision 9 will never be given effect as a consequence of our disposition in this case. In fact, the WCCA has considered at least two cases in which employers provided the option of staying at work during recreational programs. *See, e.g.*, *Paskett v. Imation Corp.*, 2013 WL 398699, at \*2 (Minn. WCCA Jan. 3, 2013); *Ellingson v. Brady Corp.*, 66 Minn. Workers' Comp. Dec. 27, 29 (WCCA), *aff'd without opinion*, 707 N.W.2d 676 (Minn. 2006). Thus, it is clear that at least some employers are logistically able to provide this option.[3]

---

[3] The dissent argues that our holding conflicts with *Ellingson* and *Paskett*, as well as *Sager v. City of Roseville*, 52 Minn. Workers' Comp. Dec. 281 (WCCA), *aff'd without opinion*, 529 N.W.2d 701 (Minn. 1995). We are not bound by WCCA decisions. Moreover, *Ellingson*, *Paskett*, and *Sager* are not before us today, and we decline to address whether the WCCA employed the proper analyses in those cases. However, it is noteworthy that, in deciding the present case, the WCCA distinguished *Ellingson* and *Paskett*. *Shire*, 2015 WL 2327967, at \*5. As addressed above, employees had the option

(Footnote continued on next page.)

9

Here, Rosemount could have paid all weekend-shift employees for the last three hours of the shift regardless of their attendance at the recognition event. Conversely, Rosemount could have paid none of the employees for the three hours at issue. In either circumstance, no implicit coercion would exist. Rosemount argues that paying all employees would be unworkable because Rosemount withheld pay for those who did not attend in order to encourage attendance. Rosemount's argument simply reinforces our conclusion that employees were implicitly coerced to attend the event in order to receive their pay and avoid depletion of their vacation benefits. Moreover, attendance by every employee is not essential to the success of a recreational program. If the Legislature intended to encourage employers to host recreational programs for the benefit of employees, as Rosemount speculates, logic and reality dictate that employers should sponsor such programs to provide an *opportunity* for employees, not a mandate.

To summarize, a recreational program is not "voluntary" when the employees' options are limited either to (1) attending the program and getting paid or (2) forfeiting pay or benefits. To conclude otherwise fails to preserve the plain words of the statute and renders the word "voluntary" in Minn. Stat. § 176.021, subd. 9, meaningless.

_____

(Footnote continued from previous page.)
of remaining at work in both cases. Unlike the Rosemount employees, the *Ellingson* and *Paskett* employees were not compelled to attend the recreational programs at issue in order to get paid. The WCCA found this distinction critical. *Id.* ("[I]n both Ellingson and Paskett, one of the options offered was that the employee might simply continue to perform his usual job, without loss of pay or benefits. We agree with the compensation judge that this distinction is a critical one in cases where the program is scheduled during an employee's normal working hours."). Similarly, in *Sager*, there is no indication that employees were required to attend the program at issue in order to receive their wages. *See* 52 Minn. Workers' Comp. Dec. at 281-82.

10

2.

The dissent would hold that Rosemount's employee-recognition event was "voluntary" for two reasons. First, the dissent argues, the relevant definition of a word "depends on the context in which [it] is used." Yet, the dissent ignores the context in which the word "voluntary" is used in Minn. Stat. § 176.021, subd. 9. Next, the dissent relies on *criminal* cases to support its interpretation of the word "voluntary."

We do not dispute the principle that we consider the context of a statute. The dissent cites *State v. Nelson*, in which we applied the canon against surplusage, 842 N.W.2d 433, 437-39 (Minn. 2014). Indeed, we apply the canon against surplusage in this case by considering the meaning of the word "voluntary" in the context of the exception for employees who are "ordered or assigned" to attend a program. In contrast, the dissent fails to apply the principle expressed in *Nelson*.[4]

Nor do we disagree with the dissent's proposed definition of a "voluntary recreational program" as "one that is attended without coercion by the employer and by an employee's act of choice among reasonable alternatives." But the dissent does not explain how forfeiting pay or benefits is a "reasonable alternative" to attending an employer-sponsored program. For employees who rely on their wages to earn a living, forfeiting pay and benefits is not a reasonable option.

---

[4] The dissent also contends that a dictionary's first-listed definition of a word expresses the word's most common meaning. Yet, the dissent maintains that we should choose the relevant definition based on the context in which the word is used. The definitions we rely on are well-suited to the context of Minn. Stat. § 176.021, subd. 9, particularly because, in order to avoid surplusage, we must define "voluntary" as distinct from the phrase "ordered or assigned."

11

Rather than considering the context of the workers' compensation statute, the dissent turns to criminal cases to support its narrow interpretation of the term "voluntary."[5] To justify this approach, the dissent cites inapposite case law. Two of the opinions relied on by the dissent cited dictionary definitions. *500, LLC v. City of Minneapolis*, 837 N.W.2d 287, 290-91 (Minn. 2013) (citing case law *and* dictionary definitions of the phrase "relating to"); *State v. Campbell*, 814 N.W.2d 1, 8 (Minn. 2012) (Stras, J., dissenting) (relying on dictionary definitions but observing that our case law had reached the same result). In the other instances cited by the dissent, we applied the technical, legal definition of a word, not the plain meaning. *500, LLC*, 837 N.W.2d at 291 (employing the technical meaning of the word "zoning"); *Odunlade v. City of Minneapolis*, 823 N.W.2d 638, 644 (Minn. 2012) (observing in dicta that "assessment," a technical, legal term, had been defined broadly in other tax cases); *see also In re Welfare of J.J.P.*, 831 N.W.2d 260, 266 (Minn. 2013) (stating that we interpret technical words according to their specialized meaning). And in not one of these cases did we reach into other areas of substantive law to determine the correct meaning of a word.

Nothing in our case law dictates that we import definitions from vastly different areas of substantive law into a completely unrelated context, and we decline to create

---

[5] Significantly, the criminal cases cited by the dissent involving voluntary confessions and voluntary guilty pleas do not employ the rules of statutory interpretation. *See, e.g.*, *State v. Riley*, 568 N.W.2d 518, 525 (Minn. 1997) (analyzing the voluntariness of a confession as required by the Due Process Clause of the Fourteenth Amendment to the United States Constitution); *State v. Ecker*, 524 N.W.2d 712, 718-19 (Minn. 1994) (discussing case law on voluntary guilty pleas).

12

such precedent here. Rather, we rely on the text of Minn. Stat. § 176.021, subd. 9, and hold that Rosemount's employee-recognition event was not "voluntary."

B.

Having decided that the employee-recognition event was not "voluntary," we next consider Rosemount's alternative argument. Rosemount contends that, even if the recognition event was not voluntary, Shire's participation in the *laser-tag game* at the event was voluntary. Subdivision 9 lists "health promotion programs, athletic events, parties, and picnics" as examples of recreational programs. Minn. Stat. § 176.021, subd. 9. Rosemount argues that the inclusion of the term "athletic events" in subdivision 9 demonstrates legislative intent to focus on the voluntariness of a single athletic activity, such as a laser-tag game, rather than the voluntariness of an entire program.

Rosemount's argument invites us to define the word "program" on an activity-by-activity basis.[6] We are not persuaded. Subdivision 9 plainly applies to injuries incurred "while participating in [a] *voluntary . . . program*[]." Minn. Stat. § 176.021, subd. 9 (emphasis added). We interpret statutes according to the rules of grammar. *Ekdahl*, 851 N.W.2d at 876 (citing Minn. Stat. § 645.08(1) (2014)). In subdivision 9, the word "voluntary" is an adjective that modifies the noun "program." *See The Chicago Manual*

_____

[6] Rosemount proposed a different theory at oral argument. According to Rosemount, the "program" could be alternatively (1) Rosemount's overall employee wellness program, (2) the employee-recognition event, or (3) the laser-tag game at the event. We need not address this theory because it was raised for the first time at oral argument. *See City of Duluth v. Cerveny*, 218 Minn. 511, 524, 16 N.W.2d 779, 786 (1944) (citing *Cutting v. Weber*, 77 Minn. 53, 54, 79 N.W. 595, 595-96 (1899)).

*of Style* 5.78 (16th ed. 2010). The plain meaning of "program" in subdivision 9 is a collection of activities. *Random House Webster's Unabridged Dictionary* 1546 (2d ed. 2001) (defining "program" as "a plan or schedule of activities, procedures, etc., to be followed"); *see also The American Heritage Dictionary* at 1407 (defining "program" as "[a]n ordered list of events to take place or procedures to be followed; a schedule"). When read as a whole, subdivision 9 requires that the *program* be voluntary, not the individual activities offered *within* the program. The placement of the word "participation" in relation to the word "voluntary" in subdivision 9 makes this clear. The Legislature did not create an exception for "injuries incurred while *voluntarily participating* in a recreational program." Rather, the Legislature created an exception for "[i]njuries incurred while participating in [a] voluntary recreational program[]." Minn. Stat. § 176.021, subd. 9. Thus, the voluntariness of an employee's participation in an individual activity does not govern the application of subdivision 9.

Rosemount's reading of subdivision 9 defies this plain meaning. Nothing in the plain language of subdivision 9 dictates an activity-by-activity analysis. "[A]thletic events, parties, and picnics," *id.*, often consist of multiple activities.[7] We decline to adopt an interpretation of the word "program" that is contrary to the word's plain, ordinary meaning. Accordingly, we hold that the phrase "voluntary recreational program" in

---

[7]    For example, there may be a volleyball game at a company picnic. Similarly, an athletic event may consist of multiple games. Yet, a single football game would constitute a "program" when the game is the sole recreational activity.

14

Minn. Stat. § 176.021, subd. 9, plainly refers to a voluntary "program," not voluntary activities within a program.

## III.

To summarize, we hold that a recreational program is not "voluntary" when the employees' choices are either to attend the program or risk forfeiting pay or benefits. We further hold that the relevant inquiry when applying Minn. Stat. § 176.021, subd. 9, is whether the *program* is voluntary, not whether individual recreational activities within the program are voluntary. Accordingly, we affirm.

Affirmed.

DISSENT

ANDERSON, Justice (dissenting).

The word "voluntary," as used in the voluntary-recreational-program exception, Minn. Stat. § 176.021, subd. 9 (2014), is unambiguous and has one reasonable plain meaning. But that reasonable plain meaning is not followed by the court's decision. Under the court's definition, a program is "voluntary" only if it is attended "willingly and without constraint or expectation of reward." And as applied by the court, the alternatives to program attendance provided by Rosemount—taking paid leave or unpaid leave—are "constraints" on "pay or benefits" such that attendance is involuntary. This is not a reasonable plain meaning for two reasons.

First, under a plain-language analysis, the meaning of a term cannot depend solely on a selected dictionary entry considered in isolation; rather, the relevant meaning also depends on the context in which the term is used. *State v. Nelson*, 842 N.W.2d 433, 437-38 & n.2 (Minn. 2014). Moreover, just because a selected definition "encompass[es] one sense of a word does not establish that the word is *ordinarily* understood in that sense." *Taniguchi v. Kan Pac. Saipan, Ltd.*, ___ U.S. ___, ___, 132 S. Ct. 1997, 2003 (2012). A definition of "voluntary" that prohibits *any* "constraint" on "pay or benefits" is an unreasonably narrow reading in the context of this statute. The plain and ordinary meaning of "voluntary" is much broader. Many prominent dictionaries define "voluntary" broadly as an "act of choice." Most choices involve some incentive or disincentive, advantage or disadvantage, but that does not mean the choice is *implicitly coerced*, such that it was involuntary. And second, although this is our first occasion to

D-1

address the plain meaning of "voluntary" under this statute, several analogous and persuasive precedents support a broader plain meaning of "voluntary," rather than the restrictive definition adopted by the court.

In short, the only reasonable meaning of a "voluntary" recreational program in the context of Minn. Stat. § 176.021, subd. 9, is one that is attended without coercion by the employer and by an employee's act of choice among reasonable alternatives. Here, Rosemount's recreational program was "voluntary" because Rosemount did not coerce Shire into attending and Shire made the choice to attend after being presented with reasonable alternatives. For these reasons, I respectfully dissent.

## I.

The Minnesota Workers' Compensation Act, Minn. Stat. §§ 176.001-.862 (2014), does not define the word "voluntary." *See* Minn. Stat. § 176.011. In the absence of statutory definitions, we interpret the words in a statute according to their plain and ordinary meaning. *500, LLC v. City of Minneapolis*, 837 N.W.2d 287, 290-91 (Minn. 2013); *see* Minn. Stat. § 645.08(1) (2014) (requiring that statutory words be construed "according to their common and approved usage"). We have considered dictionary definitions as a helpful tool in determining plain and ordinary meaning. *See, e.g.*, *Nelson*, 842 N.W.2d at 437-38 & n.2; *State v. Carufel*, 783 N.W.2d 539, 542 (Minn. 2010); *State v. Heiges*, 806 N.W.2d 1, 15 (Minn. 2011). But in drawing the relevant meaning of words from dictionaries, we must consider the context of the statute and the application of those words to the statute. *Nelson*, 842 N.W.2d at 437-38 & n.2 ("The dissent[] . . . overlooks the basic principle that the relevant definition of a term depends on the context

in which the term is used.") (citing *Carcieri v. Salazar*, 555 U.S. 379, 391 (2009); *Deal v. United States*, 508 U.S. 129, 132 (1993)); *see also* Minn. Stat. § 645.16 (2014) ("When the words of a law *in their application to an existing situation* are clear and free from all ambiguity, the letter of the law shall not be disregarded . . . ." (emphasis added)).

Many dictionaries define "voluntary" broadly by referring to free will, willingness, intention, and acts of choice, rather than the absence of "constraints." Such a broad definition is usually listed first.[1] *See Webster's Third New International Dictionary Unabridged* 2564 (3d ed. 2002) ("**1 a:** proceeding from the will : produced in or by an act of choice . . . **b:** performed, made, or given of one's own free will"); *Merriam-Webster's Collegiate Dictionary* 1402 (11th ed. 2003) ("**1**: proceeding from the will or from one's own choice or consent"); *Black's Law Dictionary* 1605 (8th ed. 2004) ("**1.** Done by design or intention"); *The American Heritage Dictionary of the English Language* 1941-42 (5th ed. 2011) ("**1.** Done or undertaken of one's own free will: *a voluntary decision to leave the job*."); *Oxford Dictionary of English* 1990 (3d ed. 2010) ("**1** done, given, or acting of one's own free will"); *New Oxford American Dictionary* 1938 (3d ed. 2010)

---

[1] Depending on the dictionary publisher, the first-listed meaning is the "most commonly sought meaning," the "most established . . . literal and central" meaning, or the historical first-known meaning. *See The American Heritage Dictionary of the English Language*, at xxiv (5th ed. 2011) ("Entries containing more than one sense are arranged for the convenience of the reader with the central and often the most commonly sought meaning [appearing] first."); *New Oxford American Dictionary*, at xv (3d ed. 2010) ("[T]he first definition given is the core sense . . . . Core meanings represent typical, central uses . . . . It is the meaning accepted by native speakers as the one that is most established as literal and central."); *Webster's Third New International Dictionary Unabridged* 17a (3d ed. 2002) ("The order of senses is historical: the one known to have been first used in English is entered first.").

("done, given, or acting of one's own free will" (listed as the first sense)).

By contrast, the language relied on by the court, which prohibits "constraints" and "influences," originates from lower-listed dictionary entries. *See Webster's Third New International Dictionary Unabridged* 2564 (3d ed. 2002) ("**e**: acting of oneself : not constrained, impelled, or influenced by another : spontaneous, free"); *Merriam-Webster's Collegiate Dictionary* 1402 (11th ed. 2003) ("**2:** unconstrained by interference"); *Black's Law Dictionary* 1605 (8th ed. 2004) ("**2.** Unconstrained by interference; not impelled by outside influence"); *The American Heritage Dictionary of the English Language* 1941-42 (5th ed. 2011) ("**2.** Acting or done willingly and without constraint or expectation of reward"). Indeed, two prominent dictionaries do not include *any* senses of "voluntary" that require the absence of "constraints" or "influences." *See Oxford Dictionary of English* 1990 (3d ed. 2010); *New Oxford American Dictionary* 1938 (3d ed. 2010).

Even without considering the ordering of definitions, the relevant meaning to draw from a dictionary depends on the context of the statute and the applicability of that meaning to this case. In other words, the goal is not to determine the meaning of "voluntary" generally, in all situations, but rather the plain and ordinary meaning of "voluntary" as applied to this specific statute and to the facts of this case. *Nelson*, 842 N.W.2d at 437-38 & n.2; *see* Minn. Stat. § 645.16.

In the context of this statute, there will almost always be *some* incentive to attend an employee-sponsored recreational program; indeed, an employer presumably designs such a program because it has a business-related goal that is advanced by employee participation. Employees may desire to attend because a program is fun and provides

opportunities to bond with coworkers. Employees may desire to attend because they will receive performance rewards, such as certificates of achievement or other types of recognition for their performance. The employer may encourage employees to attend because there will be beneficial activities, such as training, skill development, and team-building exercises. And, often, as here, the program may take place during normal work hours and involve the payment of regular wages. Conversely, there may be disadvantages to being absent because the employee will miss out on some of the above benefits. And if the program was scheduled during work hours, an absent employee may need to use some type of paid or unpaid leave. But none of the above examples of incentives or disincentives for attending a recreational program, without more, can reasonably amount to *coercion* such that an employee's free will is overborne and the choice to attend is *involuntary*. Such a conclusion does not comport with the plain and reasonable meaning of "voluntary" according to relevant dictionary definitions, and according to the context of this statute and the facts of this case.

## II.

In addition to dictionary definitions and the context of the statute, we may consider precedent that has established the meaning of words in analogous contexts. *See 500, LLC*, 837 N.W.2d at 290-91 (determining the meaning of "relating to" and "zoning" by citing definitions adopted in other cases); *Odunlade v. City of Minneapolis*, 823 N.W.2d 638, 644 (Minn. 2012) ("We have defined 'assessment' broadly . . . ." (citing cases)); *see also State v. Campbell*, 814 N.W.2d 1, 8 (Minn. 2012) (Stras, J., dissenting) ("[O]ur case law has consistently reached the same conclusion [that the term 'offense'

includes misdemeanors.]" (citing cases)). Three areas of analogous criminal cases are helpful in considering the meaning of "voluntary" acts: (1) voluntary intoxication; (2) voluntary confessions; and (3) voluntary guilty pleas. In addition, these cases are helpful in their discussion of "coercion," which is relevant to the court's central holding that Shire was "implicitly coerced" to attend Rosemount's recreational program.

*Voluntary Intoxication.* In *State v. Fearon*, 283 Minn. 90, 91, 166 N.W.2d 720, 721 (1969), we considered the ordinary meaning of "voluntary" in the context of a now-repealed statute defining the crime of drunkenness: "Every person who becomes intoxicated by voluntarily drinking intoxicating liquors is guilty of the crime of drunkenness . . . ." Minn. Stat. § 340.96 (1968) (repealed 1971). We determined that the "ordinary meaning of the word 'voluntary' is 'produced in or by an act of choice' or of one's own free will," *Fearon*, 283 Minn. at 95, 166 N.W.2d at 723 (quoting *Webster's Third New International Dictionary* 2564 (1961)), and that the meaning of the phrase "voluntarily drinking" in the statute was "drinking by choice," *id.* We did not cite any other dictionary definitions that prohibit "constraints" or "influences." We concluded that the drinking by the defendant, who suffered from the disease of chronic alcoholism, was not voluntary because he was "no more able to make a free choice as to when or how much he would drink than a person would be who is forced to drink under threat of physical violence." *Id.* at 96-97, 166 N.W.2d at 724.

*Voluntary Confessions.* If a defendant moves to suppress an allegedly involuntary confession, the state has the burden to prove the confession was "voluntary." *Doan v. State*, 306 Minn. 89, 91, 234 N.W.2d 824, 826 (1975). We have held that a confession is

involuntary only if the defendant's "*will was overborne* and his capacity for self-determination *critically impaired* by *coercive* police conduct." *State v. Thaggard*, 527 N.W.2d 804, 810 (Minn. 1995) (emphasis added) (citing *Colorado v. Spring*, 479 U.S. 564, 574 (1987)); *see also United States v. Williams*, 760 F.3d 811, 815-16 (8th Cir. 2014). In other words, "[c]oercive police activity is a necessary predicate to a finding that a statement is involuntary" and "[t]he question is whether the defendant's will was overborne." *State v. Riley*, 568 N.W.2d 518, 525 (Minn. 1997). As these cases indicate, the meaning of "voluntary" in this context does not require the absence of influences or constraints. Rather, a confession is involuntary only if the defendant's will is overborne and his capacity for self-determined decisions is critically impaired by coercive conduct.

*Voluntary Guilty Pleas*. A guilty plea is unconstitutional if it is not voluntary. *See Brady v. United States*, 397 U.S. 742, 749-55 (1970). But a guilty plea does not become involuntary merely because the state "encourages," "influence[s]," or "motivate[s]" a plea through the benefit of a lesser penalty in the plea bargain and the constraint of a higher penalty at trial. *Id.* at 749-52. Rather, a guilty plea is involuntary only if it is produced by "coercion overbearing the will of the defendant." *Id.* at 750; *see State v. Ecker*, 524 N.W.2d 712, 719 (Minn. 1994) ("Although the government may not produce a plea through actual or threatened physical harm, or by mental coercion 'overbearing the will of the defendant,' a defendant's motivation to avoid a more serious penalty or set of charges will not invalidate a guilty plea."). For example, a plea decision may be "voluntary" even if a motivating influence is particularly strong, *see e.g.*, *Brady*, 397 U.S. at 754-55 (holding that a guilty plea was not involuntary "because [it was] entered to

avoid the possibility of a death penalty" as the defendant had a "full opportunity to assess the advantages and disadvantages of a trial as compared with those attending a plea of guilty"), and even if the alternatives to a decision are unattractive, *see, e.g.*, *State v. Raleigh*, 778 N.W.2d 90, 96 (Minn. 2010) (concluding that a plea bargain to receive one life sentence instead of multiple, although "illogical," was not involuntary because the facts "show[ed] acceptance and understanding of the plea, not improper pressure or coercion.").

I recognize these examples are drawn from our criminal law and are not directly applicable here; that said, and recognizing the differences between "voluntary" in the context of workers' compensation law and in criminal law, it is noteworthy and instructive that we have applied a broader meaning to "voluntary" in a context in which there is a strict constitutional standard protecting the rights of criminal defendants. No such barrier exists here, and yet the court applies a meaning to "voluntary" that is much narrower. Why we should do this, given the plain language of the statute, dictionary definitions, and the broader meanings of "voluntary" applied elsewhere, the court does not say.

III.

These dictionary definitions and analogous precedents indicate that the plain and ordinary meaning of a "voluntary" recreational program, Minn. Stat. § 176.021, subd. 9, does not require the absence of all influences or constraints; rather, such external influences prevent a voluntary decision only if they amount to *coercion* that critically impairs willfulness and the capacity for self-determination. The most natural and

common reading of a "voluntary" recreational program under this statute is one attended without coercion by the employer and by an employee's act of choice among reasonable alternatives.

This plain meaning, focusing on an "act of choice," is persuasively supported by similar workers' compensation cases. In *Ellingson v. Brady Corp.*, 66 Minn. Workers' Comp. Dec. 27 (WCCA 2005), *aff'd without opinion*, 707 N.W.2d 676 (Minn. 2006), the WCCA concluded that because "the employee had *options*" besides attending the employer-sponsored recreational program, "his *choice* to attend" was voluntary. *Id.* at 31 (emphasis added). The employee's options included remaining at work with pay, taking a day of paid vacation, or taking a day off without pay. *Id.* This choice was voluntary even though the options were not equally attractive and the employee may have had incentives for picking one option over the others. Even if an employee prefers to receive wages, rather than use paid vacation hours or take unpaid leave, requiring an employee to choose among reasonable options does not amount to coercion. Thus, when the employee in *Ellingson* argued that his attendance was involuntary because the employer encouraged his presence by paying him, the court rejected that argument because the employee had "options" and it was "his choice" to attend. *Id.* at 30-31. Similarly, in *Sager v. City of Roseville*, 52 Minn. Workers' Comp. Dec. 281, 283 (WCCA 1994), *aff'd without opinion*, 529 N.W.2d 701 (Minn. 1995), the WCCA held that "employees are *not* excluded from the exemption of Minn. Stat. § 176.021, subd. 9, simply [because] they are

being paid a wage by the employer."[2]

In *Paskett v. Imation Corp.*, No. WC12-5494, 2013 WL 398699 (Minn. WCCA Jan. 3, 2013), the WCCA concluded that the employer's recreational program was voluntary because the employee made the choice between the alternatives of staying at work and taking paid leave. *Id.* at *2. The court rejected the employee's argument that his participation was involuntary because he did not have the option of unpaid leave, which was provided by the employer in *Ellingson*. *Id.* The court explained that "*Ellingson* cannot . . . be read to mandate that <u>all</u> of these specific alternatives be available in every case." *Id.* Rather, the employee "acknowledged . . . that he was not required or *coerced* by the employer to take part in the flag football game and that he could have stayed at work or taken paid leave instead. As such, the record as a whole easily supports . . . the voluntary nature of the employee's participation." *Id.* (emphasis added). The unifying principle of *Paskett* and *Ellingson* is that a program is "voluntary"

---

[2] Although the court cites one definition of "voluntary" that refers to the absence of a "reward," the court does not rely on this part of the definition in its analysis. It is telling that the court does not do so, because requiring the absence of "rewards" would result in an unreasonably narrow meaning of "voluntary," and would conflict with *Ellingson* and *Sager*, in which the WCCA held that an employer's payment of wages does not result in involuntary attendance. Similarly here, Rosemount arguably provided a financial "reward" or incentive to attend its program through the payment of regular wages to the program's attendees. But the court does not rely on this financial "reward" to support its conclusion that Rosemount's program was involuntary and Shire was "implicitly coerced" to attend. Thus, it appears that the court would agree that, consistent with the WCCA's holdings in *Ellingson* and *Sager*, a reasonable "reward" or financial *incentive* to attend, through the payment of regular wages, does not result in involuntary attendance. But the court does not explain how the converse of this rule, a reasonable "constraint" or financial *disincentive* to be absent (by providing the options of using paid vacation hours or taking unpaid leave) results in involuntariness.

under Minn. Stat. § 176.021, subd. 9, if the employee makes a "choice" to attend among reasonable "options" or "alternatives," and the employee is "not *coerced* by the employer" to attend. This principle falls in line with the reasonable plain meaning of "voluntary" drawn from dictionaries, analogous case law, and the context of the statute here, as discussed above.

Similarly here, Shire made a choice among reasonable alternatives presented by his employer, including (1) attending Rosemount's employee-recognition program and receiving regular wages; (2) taking paid leave by using vacation hours; and (3) taking unpaid leave. And there is no evidence that Rosemount *coerced* Shire to attend or took any action that looked remotely like coercion. Rather, evidence exists that Shire attended the program voluntarily by making his own choice. Rosemount's electronic employee handbook states that "recognition events are voluntary in purpose and all employees have the choice to decide to participate." In addition, Rosemount held several employee meetings, prior to the recreational program, in which the employees were advised of the voluntary nature of the event, presented with the alternatives of paid or unpaid leave, and advised to contact their supervisor if they did not wish to attend. But Shire never told his supervisor that he did not wish to attend the event, nor did he ever request not to attend the event. Indeed, there was no evidence that Shire told *anyone* he did not want to attend or that he felt "coerced" to attend by his employer. When Shire was asked during his deposition, "you had no reason not to attend the event?" Shire responded, "None that I can think of."

But despite this clear evidence that Shire attended the program voluntarily, the court nevertheless presumes that Shire must have been "implicitly coerced" to attend. The only basis for the court's conclusion that Shire was "implicitly coerced" is that, among the options available to Shire—attend the program with regular wages, take paid leave by using vacation hours, or take unpaid leave—there was a financial disincentive or "constraint" in favor of attending the program. *See supra* at 7 ("Contrary to these definitions, employees were 'constrained' by the fact that attendance at the employee-recognition event was the only means by which they could obtain their wages without expending limited vacation time.").

The court's decision does not follow the reasonable plain meaning of "voluntary" under Minn. Stat. § 176.021, subd. 9. Restricting the definition of this term to prohibit *any* "constraint" on "pay or benefits," and raising a presumption of "implied coercion" based on incentivized alternatives, without any direct evidence that an employee was actually coerced, contravenes the plain meaning of "voluntary" according to relevant dictionary definitions, the context of the statute, and analogous precedent. I would hold that the reasonable plain meaning of a "voluntary" recreational program under this statute is one that is attended without coercion by the employer and by the employee's act of choice among reasonable alternatives. Because Shire attended Rosemount's program by making a choice among reasonable alternatives, including the options of paid leave by using vacation hours or unpaid leave, and because there was no evidence of coercion by Rosemount, implied or otherwise, Shire's attendance was voluntary and therefore his injury was noncompensable under the voluntary-recreational-program exception, Minn.

Stat. § 176.021, subd. 9, to the Minnesota Workers' Compensation Act.  For these reasons, I respectfully dissent.